**W. Henson MOORE, U.S. Representative, 6th District, La., et al., Appellants,**

v.

**U.S. HOUSE OF REPRESENTATIVES, et al.**

**Ron PAUL, U.S. Representative, 22nd District of Texas, Appellant,**

v.

**UNITED STATES of America, et al.**

**Nos. 83–1077, 83–1190.**

United States Court of Appeals, District of Columbia Circuit.

Argued 13 Oct. 1983.

Decided 4 May 1984.

As Amended 4 May 1984.

---

James L. Kaler, Washington, D.C., with whom Sherwood B. Smith, Jr., Washington, D.C., was on the brief, for appellants in Nos. 83–1077 and 83–1190.

Ron Paul, Washington, D.C., pro se in No. 83–1190.

Douglas Letter, Atty., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., Washington, D.C. (at the time the brief was filed) and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees, United States in Nos. 83–1077 and 83–1190.

Stanley M. Brand, General Counsel, House of Representatives, Washington, D.C., with whom Steven R. Ross, Deputy Counsel, Washington, D.C., House of Representatives was on the brief for appellees, United States House of Representatives, et al. in Nos. 83–1077 and 83–1190.

Morgan J. Frankel, Asst. Senate Legal Counsel, Washington, D.C., with whom Michael Davidson, Senate Legal Counsel, M. Elizabeth Culbreth, Deputy Senate Legal Counsel and Charels Tiefer, Asst. Senate Legal Counsel, Washington, D.C., were on the brief, for appellees, United States Senate, et al. in Nos. 83–1077 and 83–1190.

Before WILKEY and SCALIA, Circuit Judges, and LUMBARD,* Senior Circuit Judge for the United States Court of Appeals for the Second Circuit.

Opinion for the court filed by Circuit Judge WILKEY.

Concurring opinion filed by Circuit Judge SCALIA.

WILKEY, Circuit Judge:

Eighteen members of the United States House of Representatives appeal from a decision of the district court which dismissed their challenge to the constitutionality of the Tax Equity and Fiscal Responsibility Act of 1982.[1] The district court dismissed their complaint on the ground that the legislators lacked standing, and, alternatively, on the ground that in the court's remedial discretion, declaratory relief should not be granted for the stated claim. We hold that the appellants have standing to sue, but we affirm the district court's

dismissal as a proper exercise of the court's remedial discretion to withhold declaratory relief for the appellants' claim.

## I. BACKGROUND

All of the appellants were members of the United States House of Representatives ("the House") for the 97th Congress, and some of them were also members of the Committee on Ways and Means of the House in that Congress. The appellants sued the United States House of Representatives, the United States Senate, the Speaker of the House, the President of the Senate, the Clerk of the House, and the Secretary of the Senate in the District Court for the District of Columbia. The United States intervened as a defendant in the case. Appellants sought a declaratory judgment that the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA")[2] was unconstitutional because it originated in the Senate in contravention of the Origination Clause of the U.S. Constitution. That clause provides that all "bills for raising revenue" shall originate in the House, although the Senate may make amendments as on other bills.[3]

The appellants' complaint alleges the following facts.[4] On 14 December 1981, H.R. 4961, which had been introduced in the House, was reported favorably to the House by the House Committee on Ways and Means. As reported by the Committee, the bill comprised six sections amending the Internal Revenue Code, the net effect of which would have been to reduce the amount of tax revenue collected. The House approved H.R. 4961 without amend-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 553 F.Supp. 267 (D.D.C.1982) (mem.).

2. Pub.L. No. 97–248.

3. U.S. Const. art. I, § 7, cl. 1. The Supreme Court has adjudicated several challenges to revenue acts under the Origination Clause, brought by private plaintiffs. *See, e.g., Flint v. Stone Tracy Co.,* 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389 (1911); *Millard v. Roberts,* 202 U.S. 429, 26 S.Ct. 674, 50 L.Ed. 1090 (1906).

4. This appeal comprises two cases filed in the district court. Representative W. Henson Moore and 17 other members of the House filed a complaint in August 1982; Representative Ron Paul filed a similar action two days later. Because the two cases present common questions of law, they were consolidated in the district court. References to the complaint hereinafter are to the complaint filed by Representative W. Henson Moore, et al.

ment and sent it to the Senate on 15 December 1981.[5]

The bill was received by the Committee on Finance of the Senate, which reported H.R. 4961 favorably to the Senate on 12 July 1982. The bill as reported to the Senate still carried the House bill number but it had been substantially amended. The six revenue-reducing provisions following the bill's enacting clause had been deleted and replaced by a massive tax-increasing proposal. Instead of reducing the amount of revenue collected, the bill as amended proposed to increase revenue by more than $98 billion over three years. The Senate passed the amended H.R. 4961, newly entitled "The Tax Equity and Fiscal Responsibility Act of 1982," and returned it to the House.[6]

Upon the bill's return to the House, Appellant Rousselot offered a resolution to the House which proposed to resolve that the Senate's amendments to H.R. 4961 contravened the Origination Clause of the Constitution. His proffered resolution further proposed that the bill be returned to the Senate without further action by the House. The Chairman of the Committee on Ways and Means of the House moved to table the appellant's resolution and the motion to table carried the House. The Chairman of the House Committee on Ways and Means, at the direction of the Committee, then moved to send H.R. 4961 to conference with the Senate, without first referring it back to the House Committee on Ways and Means. The House agreed to that motion, and the bill was sent to conference.[7] H.R. 4961 was subsequently reported out of joint conference and it passed both the House and the Senate in August 1982. The President signed the bill into law.

The appellants' complaint charges that the revenue bill as originally introduced in the House was not a bill for "raising revenue" within the meaning of the Origination Clause, because the net effect of the bill would have been to reduce the amount of revenue collected. Thus, the appellants charge, when the Senate amended H.R. 4961 so that the net effect of the bill's provisions was to increase the amount of revenue collected, the bill became one for raising revenue and it originated improperly in the Senate.[8] The merit of the appellants' claim turns on whether the phrase in the Origination Clause referring to "bills for raising revenue" means bills that increase revenue, in which case TEFRA unconstitutionally originated in the Senate under the alleged facts, or whether the phrase means all bills for collecting revenue—revenue-increasing as well as revenue-decreasing bills—in which case TEFRA constitutionally originated in the House and was merely amended by the Senate according to the facts stated in the appellants' complaint.[9]

In their complaint, the appellants allege injury in their official capacities as members of the House and of the Committee on Ways and Means of the House by the defendants' interference with the appellants' legislative duties in originating bills for raising revenue. They further allege that they were injured individually and derivatively as members of the House by abrogation of the right of the House to originate bills for raising revenues.[10]

The plaintiffs moved for summary judgment in the district court and the defend-

---

**5.** Complaint ¶¶ 3, 4; Joint Appendix (J.A.) at 17.

**6.** Complaint ¶¶ 5–7; J.A. at 17–18.

**7.** Complaint ¶¶ 8–10; J.A. at 18.

**8.** The appellants have not claimed that the Senate's amendments are unlawful on the ground that amendments of this magnitude are beyond the scope of the Senate's power to amend with respect to any type of bill. *See Flint v. Stone Tracy Co.,* 220 U.S. 107, 143, 31 S.Ct. 342, 346, 55 L.Ed. 389 (1911) (Senate may propose any amendment "germane to the subject-matter of the bill").

**9.** *See Armstrong v. United States* (S.D.Cal. 2 September 1983) (mem.) (interpreting the phrase to mean bills related to the collection of revenue); *Frent v. United States,* 571 F.Supp. 739 (E.D. Mich.1983) (same).

**10.** Complaint ¶ 13; J.A. at 19.

ants moved to dismiss the complaint on the grounds that the plaintiffs lacked standing and that the court should exercise its remedial discretion to withhold relief. The district court granted the defendants' motion to dismiss, holding that the plaintiffs lacked standing, and, alternatively, that the doctrine of remedial discretion warranted dismissal.

## II. STANDING

■ The district court held that the appellants had not alleged an injury in fact sufficient to give rise to standing. We disagree. For the purposes of determining the standing of appellants to sue, we must assume the validity of the appellants' claim and construe the complaint in favor of the complaining parties.[11] Thus we assume, but do not decide, that TEFRA unconstitutionally originated in the Senate under the alleged facts.

Article III of the Constitution limits the jurisdiction of the federal courts to "cases or controversies." This constitutional limitation on the power of the federal judiciary is reflected in principles of standing, which ensure that a party who invokes the court's jurisdiction presents a case that falls within the constitutional power of the federal courts.[12] As the Supreme Court stated in *Baker v. Carr*, in order to be a proper party to litigate a claim, the claimant must "allege such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."[13] In the recent case of *Valley Forge Christian College v. Americans United for Separation of Church and State*, the Supreme Court noted that this precondition is essential in order properly to confine the role of the Judiciary in the tripartite system of government mandated by the Constitution.[14]

■ The particular requirements of standing were summarized by the Supreme Court in *Valley Forge:*

Article III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant" ... and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision" ....[15]

In addition, the claimant's injury must fall within the zone of interests protected by the constitutional provision allegedly violated.[16] Applying those requirements to the instant case, we must determine whether (1) the congressional claimants suffered an injury in fact (2) to an interest protected by the Origination Clause, (3) which injury was caused by the defendants' actions, and (4) which injury could be redressed by a favorable decision of the court.[17] We address each of these requirements in turn.

11. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *American Federation of Government Employees v. Pierce,* 697 F.2d 303, 305 (D.C.Cir.1982).

12. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975); *Metcalf v. National Petroleum Council,* 553 F.2d 176, 189–90 (D.C.Cir.1977).

13. 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); *see Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

14. 454 U.S. 464, 474, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982).

15. *Id.* at 472, 102 S.Ct. at 758 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979) and *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925 (1976)).

16. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982).

17. *See Riegle v. Federal Open Market Committee,* 656 F.2d 873 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981); *Metcalf v. National Petroleum Council,* 553 F.2d 176, 187 (D.C.Cir.1977).

■ The appellants allege a specific injury in fact to a cognizable legal interest, thereby satisfying the first requirement of standing.[18] Suits against coordinate branches of government by congressional plaintiffs pose separation-of-powers concerns which may affect a complainant's standing to invoke the jurisdiction of the federal courts. To the extent that the Constitution envisions limited federal court jurisdiction out of respect for the coordinate branches of government, we have been reluctant to grant standing to members of Congress alleging generalized, amorphous injuries due to either the actions of their colleagues in Congress or the conduct of the Executive. Although the parties in *Valley Forge* were private taxpayers and a private college and not, as here, members of coordinate branches of government, this recent Supreme Court case reinforces the principle that where separation-of-powers concerns are present, the plaintiff's alleged injury must be specific and cognizable in order to give rise to standing.[19] Likewise, in *Harrington v. Bush,* this court insisted that congressional complainants clearly allege a concrete injury in fact to a specific legal interest in order to invoke the jurisdiction of the court.[20]

The injury alleged by appellants here is to an interest positively identified by the Constitution, which mandates a specific procedure by which a revenue-raising bill shall become law. The Origination Clause provides:

All bills for raising revenue shall originate in the House of Representatives; but the Senate may propose and concur with Amendments as on other bills.[21]

The appellants allege a specific injury in fact to a cognizable legal interest: the deprivation of an opportunity to debate and vote on the origination of TEFRA in the House. The appellants claim a specific injury in their official capacities as members of the House by the nullification of their right to originate, by debate and vote, a bill for raising revenue prior to legislative action by the Senate.

It is important to note that the injury claimed here is to the members' rights to participate and vote on legislation in a manner defined by the Constitution. Deprivation of a constitutionally mandated process of enacting law may inflict a more specific injury on a member of Congress than would be presented by a generalized complaint that a legislator's effectiveness is diminished by allegedly illegal activities taking place outside the legislative forum.[22] In *Kennedy v. Sampson,*[23] for example, this court held that Senator Kennedy had standing to sue the Executive for injury allegedly due to an unlawful pocket veto of legislation which the Senator had supported. The court found that the deprivation of a constitutional process by which a bill becomes law was a sufficiently specific injury to support standing by the congressional plaintiff. By contrast, in *Harrington v. Bush,* this court denied standing to a member of the House who claimed that certain activities of the Central Intelligence Agency were illegal, and that such unlawful conduct diminished his effectiveness as a legislator.[24] The Court found that the complaining party did not have a connection to the claimed unlawful acts of the CIA such that the outcome of the case would cause him to win or lose; he was merely a bystander. Likewise, in *Ameri-*

---

**18.** In *Community Nutrition Institute v. Block,* we noted that "the injury must be definable and discernible and, in order to establish the proper connection to the plaintiff, it must be specific." 698 F.2d 1239, 1246 (D.C.Cir.), *cert. granted,* —— U.S. ——, 104 S.Ct. 480, 78 L.Ed.2d 678 (1983).

**19.** 454 U.S. at 474, 102 S.Ct. at 759.

**20.** *See Harrington v. Bush,* 553 F.2d 190 (D.C. Cir.1977).

**21.** U.S. Const. art. I, § 7, cl. 1.

**22.** *See, e.g., American Federation of Government Employees v. Pierce,* 697 F.2d 303 (D.C.Cir.1982); *Riegle v. Federal Open Market Committee,* 656 F.2d 873 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981).

**23.** 511 F.2d 430 (D.C.Cir.1974).

**24.** 553 F.2d 190, 205, 206 & n. 68 (D.C.Cir.1977).

*can Federation of Government Employees v. Pierce,* this court held that a member of the House lacked standing to sue over the allegedly improper execution of an enacted law.[25] The injury to the legislator was a generalized grievance about the conduct of government, not a claim founded on injury to the legislator by distortion of the process by which a bill becomes law—a process in which a legislator has a right and a duty to participate.

Appellants' claimed injury here does not descend to the level of being a subjective, amorphous grievance of the legislators' diminished effectiveness due to defendants' unlawful conduct. The appellants' claimed injury—the deprivation of debate and a vote in the origination of revenue-raising legislation—is specific and concrete. The claimants have satisfied the requirement of alleging a clear injury in fact, which is essential in order to obtain judicial review of the actions of a coordinate branch of government.

Furthermore, the fact that the House as a body may have been injured by the allegedly unconstitutional origination of TEFRA in the Senate does not negate an injury in fact to the individual members. In *Kennedy v. Sampson,*[26] this court noted that when Congress' role in government is diminished by unconstitutional Executive action so, too, is the official role of individual members of Congress. Likewise, in *Goldwater v. Carter,*[27] we held that individual Senators had standing to sue the Executive in a challenge to the constitutionality of the President's termination of a Mutual Defense Treaty with Taiwan without the consent of the Senate. In *Goldwater,* the fact that the claimed unconstitutional conduct may have injured the Senate

as a body did not deprive the individual Senators of standing to sue. Standing principles do not require that a party be the most grievously injured, only that he be "among the injured." [28] Appellants here claim deprivation of a particular opportunity to vote in a manner prescribed by the Constitution. Both the alleged injury and the legal interest are specific and concrete.[29]

Never has it heretofore been suggested, as the concurrence now posits, that specific injury to a legislator in his official capacity is not a cognizable harm in the federal courts. In each congressional standing case before this court, the inquiry has properly focused on whether the harm to the legislator is definable and discernible in determining whether a congressional plaintiff has standing. From *Kennedy v. Sampson* to *Harrington v. Bush* and *American Federation of Government Employees v. Pierce,* we have held that unconstitutional deprivations of a legislator's constitutional duties or rights, such as the nullification of a legislator's vote by illegal Executive action, may give rise to standing if the injuries are specific and discernible.[30]

*Valley Forge* supports this method of analysis, as that case scrutinized the specificity of the plaintiffs' injury in holding that private taxpayers lacked standing when they failed to suffer any actual injury by an allegedly unconstitutional transfer of property from the federal government to a religious college. That case casts no shadow on the validity of prior Supreme Court cases which squarely find that an injury to a public servant in his official capacity may be a cognizable legal injury for the purposes of standing. In *Coleman*

**25.** 697 F.2d 303 (D.C.Cir.1982).

**26.** 511 F.2d 430 (D.C.Cir.1974).

**27.** 617 F.2d 697 (D.C.Cir.) (en banc), *vacated on other grounds,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979).

**28.** *Sierra Club v. Morton,* 405 U.S. 727, 731–32, 92 S.Ct. 1361, 1364–1365, 31 L.Ed.2d 636 (1972);

*Kennedy v. Sampson,* 511 F.2d 430, 435 (D.C.Cir. 1974).

**29.** *Accord, Metcalf v. National Petroleum Council,* 553 F.2d 176 (D.C.Cir.1977).

**30.** 511 F.2d 430 (D.C.Cir.1974); 553 F.2d 190 (D.C.Cir.1977); 697 F.2d 303 (D.C.Cir.1982).

*v. Miller,*[31] the Supreme Court held that state senators whose votes were unlawfully overridden by illegal action by the state's executive branch had standing to compel a proper record of legislative action under Article V of the Constitution, which governs the power to amend. The Court found that the senators had suffered a cognizable injury in their official capacities. The Court stated, "We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes.... They have set up and claimed a right and privilege under the Constitution to have their votes given effect." [32] That allegedly unconstitutional injury to official powers conferred standing on the senators. Such is the nature of the appellants' claimed injury in the instant case.

▮ When the concurrence argues that the federal courts lack power to adjudicate claims involving injury to legislators and other public officials by the unlawful deprivation of their constitutional powers and rights, it is really making a political question argument in the guise of standing analysis. The concurrence not only imports political question doctrine wholesale into standing principles, but in so doing it also greatly expands the concept of nonjusticiable political questions. While disputes under certain provisions of the Constitution may be nonjusticiable political questions committed to a coordinate branch of government, the mere fact that a case involves an unlawful deprivation of a legislator's powers by members of a coordinate branch of government does not automatically deprive the federal courts of power to adjudicate the claim.

The Supreme Court has implicitly held that issues under the Origination Clause

are *not* nonjusticiable political questions, by the Court's adjudication of several challenges to revenue acts brought under the Origination Clause.[33] The concurrence attempts to accomplish under the rubric of "standing" what the Supreme Court has rejected in its prior decisions. Indeed the concurrence concedes that its so-called "standing" analysis turns on the nature of the claim—which it defines here as "legislative powers"—and not on the identity of the parties.[34] Because *any* claim under the Origination Clause, including one brought by a private taxpayer, will necessarily pertain to the exercise of legislative power, under the concurrence's "standing" analysis, no one will ever have standing to sue for such an alleged constitutional violation.

Thus, in its application to the instant case, the concurrence's approach attempts an end-run around prior Supreme Court cases which found such issues justiciable. As applied to other cases, the concurrence's approach, by its extreme expansion of the political question doctrine in the context of standing analysis, would greatly curtail the exercise of federal court jurisdiction over matters that touch upon a coordinate branch of government.

▮ In addition to alleging an injury in fact sufficient to support standing, appellants have satisfied the other requirements of standing. The alleged injury to appellants is within the zone of interests protected by the Origination Clause.[35] Similar constitutional provisions governing the process of enacting legislation or establishing privileges or duties for one of the houses of Congress have been interpreted to protect the interests of individual members of Congress. In *Kennedy v. Sampson* and in *Goldwater v. Carter* we found that the interests of individual legislators were

---

**31.** 307 U.S. 433, 438, 59 S.Ct. 972, 975, 83 L.Ed. 1385 (1939).

**32.** *Id.* at 438, 59 S.Ct. at 975. *See also Baker v. Carr,* 369 U.S. 186, 208, 82 S.Ct. 691, 705, 7 L.Ed.2d 663 (1962).

**33.** *See supra* note 3.

**34.** *See* concurring op. at n. 2.

**35.** The zone of interests requirement examines the connection between the alleged injury to plaintiffs and the interests protected by the relevant statute or constitutional provision. *See Community Nutrition Institute v. Block,* 698 F.2d 1239, 1249 (D.C.Cir.) *cert. granted,* — U.S. —, 104 S.Ct. 480, 78 L.Ed.2d 678 (1983).

within the zone of interests protected by constitutional provisions that granted rights to the House or the Senate similar to the legislative prerogative given to the House by the Origination Clause.[36]

Furthermore, the appellants satisfy the third requirement of standing which requires that the injury alleged be traceable to the challenged actions of the defendants. The defendants' actions permitted TEFRA to originate improperly in the Senate according to the facts alleged by appellants in their complaint. That the House as a body could have prevented the enactment of TEFRA after its allegedly unlawful origination in the Senate does not deprive the individual members of the House of standing to sue. The unwillingness of a majority of the members to reject TEFRA after the allegedly unconstitutional origination of the bill in the Senate cannot deprive the appellants—minority members of the House—of their right to participate in a constitutionally prescribed method of enacting revenue-raising legislation.

Finally, the injury alleged here is capable of redress by the Judiciary, thereby satisfying the fourth requirement of standing as stated by the Supreme Court in *Valley Forge.*[37] Judicial remedies such as declaratory and injunctive relief for the claimed unlawful conduct are within the court's judicial power and thus the court is capable of remedying the violation alleged here.

The appellants have standing to maintain this action.

## III. REMEDIAL DISCRETION

■ The fact that the appellants have satisfied the constitutional requirements for standing, however, does not end our inquiry into separation-of-powers issues. While the separation-of-powers concerns presented by this case do not deprive the court of power to adjudicate under Article III—a result the concurrence would reach under the rubric of standing—they may affect the proper exercise of judicial discretion to grant or withhold declaratory relief for the stated claim. Consideration of these issues separately under the doctrine of remedial discretion permits the court to exercise judicial self-restraint in particular matters intruding upon a coordinate branch of government, and avoids both distorting the constitutional requirements for standing articulated by the Supreme Court in recent cases, and rewriting our own decisions on standing.[38]

While we could conceive of judicial remedies to right the wrong claimed here, we affirm the district court's dismissal of this action as a proper exercise of the court's remedial discretion to withhold declaratory relief. Dismissal of the claimants' action is consistent with the doctrine of remedial discretion.[39] It is important to note that

36. *Goldwater v. Carter,* 617 F.2d 697 (D.C.Cir.) (en banc), *vacated on other grounds,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979); *Kennedy v. Sampson,* 511 F.2d 430 (D.C.Cir.1974). *See supra* at p. 952.

37. 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). *See also Community Nutrition Institute v. Block,* 698 F.2d 1239, 1248–49 (D.C.Cir.), *cert. granted,* —— U.S. ——, 104 S.Ct. 480, 78 L.Ed.2d 678 (1983) (redressability involves the "connection between the alleged injury and the action requested of the court").

38. *See* McGowan, *Congressmen in Court: The New Plaintiffs,* 15 Ga.L.Rev. 241 (1981).

39. Appellees also contended that the Speech or Debate Clause, U.S. Const., Art. I, § 6, cl. 1, requires dismissal of this action. We need not decide whether the Speech or Debate Clause protects the appellees in this case from suit for

the claimed unlawful actions. Our treatment of this issue is in accord with *Davis v. Passman,* in which the Supreme Court stated that Speech or Debate issues should generally be addressed before the merits of the case are litigated. 442 U.S. 228, 235 n. 11, 99 S.Ct. 2264, 2272 n. 11, 60 L.Ed.2d 846 (1979). Because we affirm dismissal of the appellants' claim at the threshold of litigation, we have relieved appellants of the burden of defending themselves on the merits of the case. We need not, therefore, inquire into the extent of constitutional immunity from suit afforded by the Speech or Debate Clause. *See, Vander Jagt v. O'Neill,* 699 F.2d 1166, 1171 n. 8 (D.C.Cir.) *cert. denied,* —— U.S. ——, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983). Furthermore, we should avoid deciding "questions of a constitutional nature unless absolutely necessary to a decision of the case." *Burton v. United States,* 196 U.S. 283, 25 S.Ct. 243, 49 L.Ed. 482 (1905); *Ashwander v. Tennessee Valley Authority,* 297

the appellants here requested only declaratory relief. Declaratory relief is discretionary with the Court, and it may be denied when prudential considerations counsel against its use. In *Winpisinger v. Watson*, this court noted that declaratory relief should be denied when it will not serve a useful purpose.[40] And in *Lampkin v. Connor*, we affirmed the dismissal of plaintiffs' claim because, as a prudential matter, granting declaratory relief would be unwise.[41]

■ The principle that a meritorious plaintiff is not automatically entitled to declaratory relief regardless of the availability of other forms of relief is not a new one in the federal courts. In *Brillhart v. Excess Insurance Co.*, Justice Frankfurter, writing for the Court, upheld a district court's dismissal of an action for declaratory relief as a proper exercise of the court's discretion to decline to afford declaratory relief.[42] Although the district court had jurisdictional power to hear the case, the Court held that federalism concerns properly counseled restraint in affording declaratory relief to the parties before the court. Likewise, in *Wilderness Society v. Morton*[43] this court, sitting *en banc*, declined to afford declaratory relief to a plaintiff challenging the legality of action by an administrative agency. Despite the existence of jurisdiction to decide the merits, not a single judge dissented from the holding that the court should exercise its "judicial discretion to dismiss the action without a determination on the merits."[44] The *en banc* court noted that the issuance of a declaratory judgment is discretionary and that where a case involves "difficult questions concerning the relationship between

the legislative and executive branches," that discretion may be properly exercised by declining to grant declaratory relief.[45] Such an exercise of discretion may be proper, even if, as in that case, no other form of relief was requested or granted for the stated claim.

The exercise of this judicial discretion in actions by congressional plaintiffs for declaratory relief has given the courts the needed flexibility to consider separation-of-powers concerns in determining whether relief properly should be granted, without impairing clarity of standing analysis. In *Riegle v. Federal Open Market Committee*,[46] this court affirmed the dismissal of a senator's suit challenging the constitutionality of the Federal Reserve Act. That act requires that five of the twelve members of the Federal Open Market Committee ("FOMC") be elected by the Board of Directors of the Federal Reserve Banks, without the advice and consent of the Senate, and they must be presidents or first vice-presidents of those banks. Senator Riegle argued that this selection process violated his rights under the Appointments Clause and he sought to enjoin the five Federal Reserve Bank members of the FOMC from voting. Although we held that Senator Riegle had standing to sue, prudential concerns led us to affirm dismissal of the action. First, Senator Riegle's dispute was primarily with other members of Congress, and he "could obtain substantial relief from his fellow legislators through the enactment, repeal, or amendment of a statute."[47] Second, private plaintiffs had standing to challenge the statute, affording an opportunity for review of the statute in

U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

**40.** 628 F.2d 133, 141 (D.C.Cir.), *cert. denied*, 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980).

**41.** 360 F.2d 505 (D.C.Cir.1966).

**42.** 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942). *See also Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 1238 (1969).

**43.** 479 F.2d 842 (D.C.Cir.) (en banc), *cert. denied*, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973).

**44.** *Id.* at 886.

**45.** *Id.* at 887.

**46.** 656 F.2d 873 (D.C.Cir.), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981).

**47.** *Id.* at 811.

a setting where separation-of-powers concerns were less acute. We concluded that when a congressional plaintiff's dispute is primarily with other members of Congress and when private plaintiffs would have standing to challenge the allegedly unconstitutional conduct, the doctrine of remedial discretion counsels judicial restraint in affording the congressional plaintiff declaratory or injunctive relief.

This court reaffirmed those principles in *Vander Jagt v. O'Neill*.[48] In that case, congressional plaintiffs sued members of the House, seeking a judicial determination that the committee appointments system employed by the House leadership was unconstitutional. The court held that the plaintiffs had standing to sue but that the suit should be dismissed for prudential considerations. It noted that respect for a coordinate branch of government counseled restraint in the exercise of the court's remedial powers. And recently in *Crockett v. Reagan*, we affirmed the dismissal of a congressional plaintiff's challenge to congressionally approved aid to El Salvador, on the ground that dismissal was a proper exercise of the court's remedial discretion to withhold relief.[49]

Prudential considerations present in those suits prompted judicial restraint in the exercise of the federal court's remedial powers under Article III. Congressional actions pose a real danger of misuse of the courts by members of Congress whose actual dispute is with their fellow legislators. We are reluctant to meddle in the internal affairs of the legislative branch, and the doctrine of remedial discretion properly permits us to consider the prudential, separation-of-powers concerns posed by a suit for declaratory relief against the complainant's colleagues in Congress.[50]

In the instant case, the appellants' dispute over the origination of TEFRA is primarily a controversy with other members of Congress. As in *Riegle, Vander Jagt,* and *Crockett,* this factor counsels restraint in the exercise of our remedial powers. Here, the appellants seek to vindicate their rights by asking us to declare TEFRA a nullity, but, as in *Riegle,* those rights can be vindicated by congressional repeal of the statute. Furthermore, we note that private taxpayers have been found to have standing to challenge the constitutionality of TEFRA under the Origination Clause, so the issue will not go unresolved.[51] Given the separation-of-powers concerns posed by this suit, we find that the district court was properly reluctant to exercise its remedial powers to grant the appellants the declaratory relief requested.

## IV. CONCLUSION

We conclude that the congressional appellants have standing to challenge the constitutionality of TEFRA under the Origination Clause. We affirm the district court's dismissal, however, as a proper exercise of the court's discretion to withhold declaratory relief for prudential reasons. Accordingly, the judgment of the district court is

*Affirmed.*

SCALIA, Circuit Judge, concurring in result:

The chancellor's foot has never been considered a particularly satisfactory unit of measure, even for matters of relatively small public consequence. It is regrettable to see it applied, now for the fourth time in a panel opinion of this court, as a substitute for the doctrine of standing in marking off the separation of powers. I write separately because, while agreeing that we should abstain from deciding this dispute, I

---

**48.** 699 F.2d 1166 (D.C.Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983).

**49.** 720 F.2d 1355 (D.C.Cir.1983).

**50.** *See generally,* McGowan, *Congressmen in Court: The New Plaintiffs,* 15 GA.L.REV. 241 (1981).

**51.** *See Armstrong v. United States* (S.D.Cal. 2 September 1983) (mem.); *Frent v. United States,* 571 F.Supp. 739 (E.D.Mich.1983).

view that abstention to be the result not of our discretion but of constitutional command. As the District Court correctly found, these plaintiffs have no standing to press their grievance before this Branch.

## I. STANDING

This is not a suit between two individuals regarding action taken by them in their private capacities; nor a suit between an individual and an officer of one or another Branch of government regarding the effect of a governmental act or decree upon the individual's private activities. It is a purely intragovernmental dispute between certain members of one house of the' Legislative Branch and—in decreasing order of proximity—(1) their own colleagues, (2) the other house of the same Branch, and (3) the Executive Branch, concerning the proper workings of the Legislative Branch under the Constitution. Such a dispute has no place in the law courts.

The majority opinion's discussion of the nature of the doctrine of standing begins with the quotation that the doctrine requires the claimant to "allege such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Maj. op. at 950. This is a quotation from *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), which described that requirement as "the gist of the question of standing," *id.* The same excerpt was quoted by the Supreme Court in *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), with the further elucidation that:

> The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to judicial interference in areas committed to other branches of the Federal Government.... [I]n terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.

*Id.* at 100–01, 88 S.Ct. at 1953. If the constitutional content of the doctrine of standing were indeed so limited, the majority's disposition of this issue might be correct. In fact, however, the *Baker-Flast* approach to standing has been repudiated by later Supreme Court cases, which affirm that the doctrine is meant not merely to assure our ability to appraise issues, through presence of the historically customary "concrete adverseness," *Flast, supra*, 392 U.S. at 101, 88 S.Ct. at 1953, but is rather "founded in concern about the proper—and properly limited—role of the courts in a democratic society," *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975), and has a special function as a "precondition" to "[t]he exercise of judicial power [which] affects relationships between the coequal arms of the National Government," *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982).

The majority opinion acknowledges that "[s]uits against coordinate branches of government by congressional plaintiffs pose separation-of-powers concerns which may affect a complainant's standing." Maj. op. at 951. Despite this recognition, however, the test of congressional standing that the majority proceeds to apply seems to me entirely lacking in relevant separation-of-powers content: "[We have] insisted that congressional complainants clearly allege a concrete injury in fact to a specific legal interest," *id.* at 951, rather than "generalized, amorphous injuries," *id.* Here, we are told, the appellant's claimed injury "does not descend to the level of being a subjective, amorphous grievance of the legislators' diminished effectiveness," *id.* at 952, but is rather "specific and concrete [injury]," *id.*, to "an interest positively identified by the Constitution, which mandates a specific procedure by which a revenue-raising bill shall become law," *id.* at 951. All this may have

much to do with the strength of appellants' claim on the merits; or with the question whether their complaint should have been dismissed for vagueness; but I fail to see how it significantly affects whether our acting in this case will produce a greater or lesser disruption of the separation of powers. To the contrary, it seems to me that setting ourselves up as arbiters of this internal dispute over whether the House may, if it wishes, accept tax legislation allegedly originated in the Senate, is much more disruptive than resolution of the more "vague and generalized" legislator challenge to the CIA's expenditure of funds not appropriated and accounted for as constitutionally required, which we found nonjusticiable in *Harrington v. Bush*, 553 F.2d 190 (D.C.Cir.1977). The irrationality of the test is well enough demonstrated by *American Federation of Government Employees v. Pierce*, 697 F.2d 303 (D.C.Cir.1982), where we held that a congressman did *not* have standing to challenge an agency's disregard of a committee-veto provision in his capacity as a member of the House, but *did* have standing as a member of the relevant committee. It is impossible to discern how there is any difference between the two, insofar as concerns the degree to which our resolution of the dispute would intrude into the workings of the other branches.

What has happened is that our opinions have mechanically extended the "vague and generalized grievance" test from an area where it makes sense to an area where it makes nonsense. When a suit by a private citizen is involved, the specificity with which the Constitution or a statute confers a right upon that particular individual as opposed to the citizenry at large does control the standing inquiry, *see, e.g., Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). This is because in that context it can be said that the courts' "province ... is, solely, to decide on the rights of individuals," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803), whereas relieving "generalized grievances," *Richardson, supra*, 418 U.S. at 176, 94 S.Ct. at 2946, or protecting "interest[s] common to all members of the public," *Ex parte Levitt*, 302 U.S. 633, 634, 58 S.Ct. 1, 1, 82 L.Ed. 493 (1937), is the business of the political branches. When, however, the plaintiff is himself a member of one of the political branches, and asserts a "right" that consists of the exercise of (or participation in the exercise of) a political power, *the business of the political branches is the very object of the dispute*, no matter with what degree of particularity the "right" has been conferred. As succinctly put in our leading case concerning congressional standing, "[t]he subject matter at stake in this litigation is legislative power." *Kennedy v. Sampson*, 511 F.2d 430, 435 (D.C.Cir.1974). Since that is so, it is impossible to say that we intrude upon the prerogatives of the Legislative Branch less severely when we resolve, for example, an internal dispute regarding the provision that "[t]he Vice President of the United States shall be President of the Senate," U.S. Const. art. I, § 3, cl. 4, than we do when we resolve an internal dispute regarding the provision that "[n]either House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days," U.S. Const. art. I, § 5, cl. 4, simply because the former confers a "right" upon an individual with more specificity and particularity.

This erroneous test of congressional standing would long since have fallen of its own weight if the doctrine of equitable discretion had not been summoned forth to save us from the unacceptable results it produced. I will say more of that construct later, but for the moment I must note how strange it is that a doctrine (the doctrine of standing) *"founded in concern"* for the separation of powers, *Warth v. Seldin, supra*, 422 U.S. at 498, 95 S.Ct. at 2204 (emphasis added), should now have yielded, four times within the last four years, and thrice within the last year, a result so repugnant to the separation of powers that we have had to exercise our

supposed equitable powers to forestall it. See, in addition to the present case, *Riegle v. Federal Open Market Committee*, 656 F.2d 873·(D.C.Cir.), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981); *Vander Jagt v. O'Neill*, 699 F.2d 1166 (D.C.Cir.1983), *cert. denied*, ___ U.S. ___, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983); *Crockett v. Reagan*, 720 F.2d 1355 (D.C.Cir.1983). Any scientific theory which required this kind of adjustment would be pronounced useless and discarded. What does it take, one wonders, to arouse judicial suspicions that a legal theory is wrong?

The only test of congressional standing that is both consistent with our constitutional traditions and susceptible of principled application (*i.e.*, an application undistorted by the *ad-hoc* ery of "remedial discretion") must take as its point of departure the principle that we sit here neither to supervise the internal workings of the executive and legislative branches nor to umpire disputes between those branches regarding their respective powers. Unless and until those internal workings, or the resolution of those inter-branch disputes through the system of checks and balances ("[a]mbition ... counteract[ing] ambition," THE FEDERALIST NO. 51, at 349 (Madison) (J. Cooke ed. 1961)) brings forth a result that harms private rights, it is no part of our constitutional province, which is "solely, to decide on the rights of individuals," *Marbury v. Madison, supra*, 5 U.S. (1 Cranch) at 170, 2 L.Ed. 60. As the cases that have been brought before us since *Mitchell v. Laird*, 488 F.2d 611 (D.C.Cir.1973), demonstrate, that principle is reduced to meaninglessness, and the system of checks and balances replaced by a system of judicial refereeship, if the officers of the political branches are deemed to have a personal,

"private" interest in the powers that have been conferred upon them (whether specifically or vaguely) by Constitution or statute. Unless those powers have been denied in such fashion as to produce a *governmental result* that harms some entity or individual who brings the matter before us, we have no constitutional power to interfere.

In my view no officers of the United States, of whatever Branch, exercise their governmental powers as personal prerogatives in which they have a judicially cognizable private interest. They wield those powers not as private citizens but only through the public office which· they hold. Whatever the realities of private ambition and vainglory may be, in contemplation of law their personal interest in full and unfettered exercise of their authority is no greater than that of all the citizens for whose benefit (and not for the personal benefit of the officeholder) the authority has been conferred. They have a private right to the office itself, *see Marbury v. Madison, supra*, and to the emoluments of the office, *see Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935); but the powers of the office belong to the people and not to them.[1] If this were not so, we would be besieged with lawsuits, not only on the part of congressional plaintiffs seeking full recognition of their powers by their congressional colleagues and by the Executive Branch, but also on the part of executive officers, asking us rather than the President to resolve conflicts in their authorities, or even challenging presidential resolution. I do not say we cannot reach such issues; but we do so in the context of a complaint that

---

**1.** I do not assert that this is either a law of nature or a scientific description of the "real world." It is a conceptualism that reflects, and facilitates application of, the doctrine of separation of powers. It is not necessarily extendible, therefore, to the governmental powers of state officers, which are not insulated from our scrutiny by that doctrine. *See Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). For an analogous situation where the rules of

standing differ in federal versus state-and-local cases, *compare Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), denying, on separation of powers grounds, federal taxpayer standing to challenge federal expenditures, *with Crampton v. Zabriskie*, 101 U.S. 601, 25 L.Ed. 1070 (1880), granting county taxpayer standing to challenge county board expenditures.

irregular process has produced legislative or executive action or inaction that harms the plaintiff, *see INS v. Chadha,* —— U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and not through a supervisory inquiry into the process itself on the theory that each of its official participants has a personal "right" to performance of his constitutionally or statutorily assigned role. To put the point slightly differently: a proper understanding of the doctrine of separation of powers suggests that the personal desires of legislative and executive officers to exercise their authority are not within the "zone of interests" protected by the provisions of the Constitution and laws conferring such authority. *See Valley Forge, supra,* 454 U.S. at 474, 102 S.Ct. at 759. Only the interests of particular individuals who would be aided by the exercise of that authority—and have been harmed by its unlawful deprivation—come within that zone, since the authority was conferred for the benefit not of the governors but of the governed.[2]

Despite what seems to me the obvious (and, in light of the frequent invocation of equitable discretion, self-confessed) inadequacy of the standing test applied by the majority, I would not be disposed to question it if the law of this circuit on the subject of congressional standing were stable and seemed, by reason of the failure to review it, to have the tacit approval of the Supreme Court. Neither is true. In addition to the fact that the recently devised

sky-hook of equitable discretion is a revision of our standing doctrine under another name, even without that development our holdings in this field have displayed a notable inconsistency. The panel opinion in *Harrington v. Bush, supra,* 553 F.2d at 207–09, abandoned the holding on standing of *Mitchell v. Laird, supra,* which had been decided only four years earlier. *Riegle v. Federal Open Market Committee, supra,* is flatly inconsistent with the reasoning of *Reuss v. Balles,* 584 F.2d 461 (D.C.Cir.), *cert. denied,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 .(1978), which involved precisely the same issue (a congressman's challenge to the allegedly unconstitutional composition of the Federal Open Market Committee of the Federal Reserve System).[3] Moreover, largely through application of the doctrine of equitable discretion, with one exception all of our decisions in this field since *Kennedy v. Sampson* have awarded judgment *for* the party that was challenging standing, so that there has been no ability to seek Supreme Court review on that point.[4] The exception was *Goldwater v. Carter,* 617 F.2d 697 (D.C.Cir.1979) (en banc), which can hardly be considered to represent tacit Supreme Court approval of our course, since *certiorari* was accepted and the judgment was vacated on other jurisdictional grounds, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979). The Supreme Court itself, of course, has never found standing to resolve, or reached the merits of, an intra- or inter-branch dispute presented by a federal

---

**2.** The article by Judge McGowan relied upon by the majority, Maj. op. at nn. 38 & 50, asserts that "[s]tanding, although reflecting a desire for judicial restraint, does not address the separation-of-powers concerns inherent in any suit by a legislator against the Executive Branch," since "standing has always been thought of as turning upon the relationship of plaintiff to claim, not upon the relationship of plaintiff to defendant that is so troublesome here." McGowan, *Congressmen in Court: The New Plaintiffs,* 15 GA.L. REV. 241, 255 (1981). It seems to me, however, that it is not the relationship of plaintiff to defendant that gives trouble in these cases. There is no problem in entertaining a suit by a congressman against the Executive Branch for a

tax refund, or by a congressman against the Speaker of the House for breach of a commercial contract. It is precisely the "nature of the claim" that gives difficulty—that is, a claim pertaining to the congressman's exercise of legislative powers.

**3.** The factor which *Riegle* asserts explains *Reuss's* contrary holding, *see* 656 F.2d at 879 n. 7, is not even mentioned in the portion of *Reuss* dealing with legislator standing, 584 F.2d at 465–68.

**4.** In *Kennedy v. Sampson,* itself, *certiorari* could have been sought but was not.

officer whose only asserted injury was the impairment of his governmental powers.[5]

Our leading case involving congressional litigation, and the only unvacated case in which our finding of standing made any difference to the outcome, is *Kennedy v. Sampson.* It was based upon the premise that " 'the gist of the question of standing' " is whether the plaintiff has " 'alleged such a personal stake in the outcome of the controversy as to assure ... concrete adverseness,' " 511 F.2d at 435, *quoting from Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). As discussed above, that view of the doctrine, which isolates it from major separation-of-powers concerns, has been revised by later Supreme Court cases, which acknowledge that standing is "founded in concern about the proper—and properly limited—role of the courts in a democratic society," *Warth v. Seldin, supra,* 422 U.S. at 498, 95 S.Ct. at 2204. *Kennedy* is no longer good law.[6]

**5.** In the Supreme Court's disposition of *Goldwater v. Carter, supra,* only the dissent of Justice Brennan reached the standing issue—and that only by implication, since it proceeded directly to the merits. The Court's summary affirmance of *Pressler v. Blumenthal,* 434 U.S. 1028, 98 S.Ct. 758, 54 L.Ed.2d 776 (1978), could, as Justice Rehnquist's concurrence noted, "rest as readily on our conclusion that appellant lacked standing to litigate the merits of the question as it could on agreement with the District Court's resolution of the merits of the question." *Id.* at 1029, 98 S.Ct. at 758.

**6.** The majority claims that the foregoing analysis of legislator standing "really mak[es] a political question argument in the guise of standing analysis," Maj. op. at 953, and thereby "attempts an end-run around prior Supreme Court cases which found [origination clause] issues justiciable," *id.* That is not so. The conclusion of the analysis is not that the issue of whether a tax bill originated in the House of Representatives is nonjusticiable (a private party injured by the resulting legislation can litigate it, *see supra* at 959). Rather, the conclusion is that injury to legislative powers is not constitutionally sufficient to enable *these* plaintiffs to bring the issue before us.

It is true, as the majority says, that "*any* claim under the Origination Clause, including one brought by a private taxpayer, will necessarily pertain to the exercise of legislative power," *id.*

## II. REMEDIAL DISCRETION

As noted earlier, the theory of congressional standing with which I have taken issue here has displayed one flaw in four of its last five applications [7]: it has produced a concededly unacceptable result. Enter the doctrine of "remedial discretion" (in *Riegle* and *Crockett, supra,* it is called "equitable discretion," and I shall use the terms interchangeably).

Believing as I do that the Constitution entirely forbids this suit, I can hardly disagree with the proposition that, if we entertain it, we should exercise whatever discretion we possess—equitable, remedial or other—to withhold relief. Considerations adequate to oust our jurisdiction are *a fortiori* adequate to justify our discretionary refusal to act. But the consequences of substituting one approach for the other are significant.

The majority's approach rests upon the following insight of *Riegle v. Federal Open Market Committee, supra,* the case

at 953, but the majority is wrong to conclude from this that "under the concurrence's 'standing' analysis, no one will ever have standing to sue for such an alleged constitutional violation," *id.* A taxpayer suit may "pertain to the exercise of legislative power" in the sense that whether legislative power was exercised properly is relevant to the outcome. But in such a suit the improper exercise of legislative power is not, as it is here, the very *gravamen* of the complaint. The taxpayer complains *that the government is taking his money wrongfully* because the House did not originate the legislation. These plaintiffs complain *that the House did not originate the legislation.*

It is of course correct that the considerations I rely upon to mark out the boundaries of the doctrine of standing are similar to considerations that may invoke the political question doctrine. It could hardly be otherwise, since the principal purpose of both doctrines is to preserve the separation of powers. That no more suggests, however, that the one is the same as the other than the shared purpose of producing economic welfare makes the Sherman Act an "end-run" around the commerce clause.

**7.** Since the decision of *Riegle* in 1981, only in *American Federation of Government Employees v. Pierce, supra,* have we sustained congressional standing without invoking equitable discretion. Even in that case, of course—as in every unvacated case except *Kennedy*—the finding of standing was inconsequential to the result.

which would, in the currently favored hackney, be the "_____ and its progeny" of this doctrine:

> The most satisfactory means of translating our separation-of-powers concerns into principled decisionmaking is through a doctrine of circumscribed equitable discretion.... [T]his test avoids the problems engendered by the doctrines of standing, political question, and ripeness.

656 F.2d at 881. It is interesting to speculate how the character of our law would be changed if the wisdom of solving separation-of-powers problems through broad reliance upon equitable discretion had only been comprehended sooner. When Chief Justice Marshall addressed the controversial question whether mandamus [8] could issue to so prominent an executive officer as the Secretary of State, he asked (it has always been thought rhetorically):

> [W]hat is there, in the exalted station of the officer, which shall bar a citizen from asserting, in a court of justice, his legal rights, or shall forbid a court to listen to the claim, or to issue a *mandamus* ...?

*Marbury v. Madison, supra,* 5 U.S. (1 Cranch) at 170. Although the Chief Justice was forced to admit that "it is not perceived, on what ground the courts of the country are ... excused from the duty of giving judgment that right be done," *id.* at 171, we now perceive that the answer is remedial discretion. And when the Chief Justice reached the further separation-of-powers issue whether the Court could declare an Act of Congress unconstitutional, he reasoned:

> It is, emphatically, the province and duty of the judicial department, to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule.... [I]f a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case, conformable to the law, disregarding the constitution; or conformable to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case: this is of the very essence of judicial duty.

*Id.* at 177–78. Had Justice Marshall only known the Turkish delights of remedial discretion, he would have realized that this was not the unavoidable duty of the court at all.

I do not doubt that separation-of-powers considerations can lead to the denial of discretionary relief if other relief is available. *See Adams v. Vance,* 570 F.2d 950 (D.C.Cir.1978); *cf. Rizzo v. Goode,* 423 U.S. 362, 378–79, 96 S.Ct. 598, 607–608, (1976) (dictum). But where, as here, that ordinary condition to the denial of discretionary relief does not exist—so that the practical effect of denying relief and denying standing is precisely the same—our legal tradition from *Marbury v. Madison* forward suggests that any role for judicial discretion in protecting separation of powers must be an extremely limited one, reserved for unique or at least distinctive factual contexts. It cannot be applied so generally to entire classes of litigation, and on the basis of such factors, as to warrant the overt admission that discretion is an alternative to the doctrine of standing. I know of no precedent for the assertion, which has been made in this *Riegle* line of cases, of a discretion to grant or withhold the only available relief [9] on the basis of a

---

8. Although mandamus is classed as a legal remedy, its issuance is discretionary, and largely controlled by equitable principles. *United States v. Dern,* 289 U.S. 352, 359, 53 S.Ct. 614, 617, 77 L.Ed. 1250 (1933); *Duncan Townsite Co. v. Lane,* 245 U.S. 308, 312, 38 S.Ct. 99, 101, 62 L.Ed. 309 (1917).

9. With one exception, all of the cases cited in the majority opinion to establish that it is not novel to deny declaratory relief "regardless of the availability of other forms of relief," Maj.

op. at 955, involve situations in which alternate relief was not available in the current proceeding *but was available later or elsewhere*— and that factor was important to the courts' analysis. *See Samuels v. Mackell,* 401 U.S. 66, 69–72, 91 S.Ct. 764, 766–767, 27 L.Ed.2d 688 (1971); *Brillhart v. Excess Ins. Co.,* 316 U.S. 491, 494–96, 62 S.Ct. 1173, 1175–1176, 86 L.Ed. 1620 (1942); *Wilderness Society v. Morton,* 479 F.2d 842, 886–87 (D.C.Cir.) (en banc), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973);

factor that is not accidental or extrinsic but pertains to the identity of the parties and the very nature of the claim. When the impropriety of granting relief derives from such a jurisdictional characteristic, the courts have not hidden behind a massive "remedial discretion," but have admitted their lack of power to rule in favor of the plaintiff because of lack of standing, *see Richardson, supra,* or sovereign immunity, *see Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

As suggested by my earlier reminiscence of *Marbury v. Madison,* one conceivable consequence of expanding the doctrine of equitable discretion to do the duty of standing is that courts will decline to act where they have hitherto acted. However, given the realities of institutional ambition that were the reason for establishing the separation of powers, such untoward self-abnegation is not the major risk. The real risk, the predictable effect and the evident purpose is just the opposite. Under the doctrine of standing, once it is determined that this is a suit by congressmen, against congressmen, pertaining to their respective legislative powers, that is an end of the matter. With remedial discretion, however, while that characteristic of the claim *may* produce judicial abstention it will not necessarily do so. The court will proceed to consider, case by case, whether its involvement would "not serve a useful purpose," Maj. op. at 955, or would be "unwise," *id.*

While such a regime may quiet judges' fears that we will be compelled to do harm (or to stir up a storm of congressional and popular opposition) by the normal exercise of our powers, it hardly meets the fears that produced the doctrine of separation of powers in the Constitution. Whenever we deal with separation-of-powers concerns affecting the Third Branch, in any context, we are judges in our own cause. But we judge under some constraint when the context is that which I discussed in Part I above—the application of a principled and intelligible doctrine of standing, faithful to our constitutional heritage and (in theory) externally imposed, which reflects separation-of-powers concerns. It is quite another thing to sit in judgment of our own powers in the case-by-case context of determining whether it is "wise" or "useful" for us to intervene in a particular dispute.

All of the factors that are to go into that Solomonic determination (made, alas, by mere ordinary judges) have not yet been established. One factor, however, has been given prominent attention in all the cases, from progenitor *Riegle* to its current offspring: whether, if the requested relief is not afforded, "non-frivolous claims of unconstitutional action would go unreviewed by a court," *Riegle, supra,* 656 F.2d at 882—or, as the majority opinion puts it, whether "the issue [of the constitutionality of this statute] will ... go unresolved," Maj. op. at 956. If such an untoward consequence is likely, the discretionary relief will not be withheld. That single fac-

*Lampkin v. Connor,* 360 F.2d 505, 511–12 (D.C. Cir.1966). The one exception is *Winpisinger v. Watson,* 628 F.2d 133 (D.C.Cir.), *cert. denied,* 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980), and there it is significant that the discretionary denial of relief was an alternate ground, the first basis being (precisely what one would expect when not-otherwise-available relief is denied without reaching the merits) a jurisdictional one, *viz.,* lack of standing. That first ground, of course, meant that the court had no jurisdiction to speculate upon the second, so it is the weakest of dictum.

The majority confides that it "could conceive of judicial remedies [other than the requested declaratory relief] to right the wrong claimed here," Maj. op. at 954. I cannot. If I could, however (and if I believed there was standing), I

would heed the command of Fed.R.Civ.P. 54(c) that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings," and the well established principle that a complaint shall not be dismissed for failure to state a claim simply because it demands a form of relief the court cannot grant, if alternative relief the court can grant is available. *See, e.g., Holt Civic Club v. Tuscaloosa,* 439 U.S. 60, 65–66, 99 S.Ct. 383, 387–388, 58 L.Ed.2d 292 (1978). If the majority can conceive of relief, it should provide it; and if it cannot it must live with the unpleasant truth that the *Riegle* notion of equity to which it subscribes leaves a whole class of plaintiffs with a right, but no remedy—a situation which equity was created to avoid rather than produce.

tor displays what a reversal of our legal system is in process: *Marbury* found that since the courts had to decide the case, the constitutionality of the statute had to be reviewed; *Riegle et seq.* find that since the constitutionality of the statute has to be reviewed, the courts must decide the case. *Riegle* justifies this progression by positing a "mandate of the federal courts to 'say what the law is,'" 656 F.2d at 882, *quoting from Marbury v. Madison, supra,* 5 U.S. (1 Cranch) at 177. There is of course no such mandate, or else advisory opinions would be proper. As *Marbury v. Madison* makes clear, the duty to "say what the law is" is not an independent mission, as *Riegle* would make it, but only a consequence that attaches when the resolution of private claims (which *is* the court's mandate) requires the court to "apply the rule to particular cases," *id.* Or as the Supreme Court put it in a later case:

> We have no power *per se* to review and annul acts of Congress on the ground that they are unconstitutional. That question may be considered only when the justification for some direct injury suffered or threatened, presenting a justiciable issue, is made to rest upon such an act. Then the power exercised is that of ascertaining and declaring the law applicable to the controversy. It amounts to little more than the negative power to disregard an unconstitutional enactment, which otherwise would stand in the way of the enforcement of a legal right.... If a case for preventive relief be presented the court enjoins, in effect, not the execution of the statute, but the acts of the official, the statute notwithstanding.... To do [otherwise] would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess.

*Frothingham v. Mellon, supra,* 262 U.S. at 488–89, 43 S.Ct. at 601. The majority's view, that it would be proper to entertain the present suit if the constitutionality of this particular statute might otherwise escape judicial scrutiny, should be compared with the Supreme Court's assessment:

> It can be argued that if respondent is not permitted to litigate this issue, no one can do so. In a very real sense, the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process.

*United States v. Richardson, supra,* 418 U.S. at 179, 94 S.Ct. at 2947. To convert the sometimes inescapable necessity of considering the validity of statutes into a continuing *mission* to do so; and then to convert standing into equitable discretion as though it makes no great difference, is to toy with the separation of powers.[10]

\* \* \* \* \*

The majority opinion considers it highly relevant to the denial of discretionary relief that "private taxpayers have been found to have standing to challenge the constitutionality of [the legislation whose process of enactment is at issue here] under the Origination Clause." Maj. op. at 956. The majority would not, I suspect, consider such a factor pertinent in the case of other rights: "Since other parties to this contract have been found to have standing to challenge its validity, the need of this plaintiff for declaratory relief is less compelling." "Since other employees have been found to

---

**10.** The appealing notion of equitable discretion as a substitute for constitutional prohibition has, predictably, spread to other jurisdictional doctrines:

> The parties attempt to categorize the decision to be made here either as one of "ripeness" or "mootness." We see no reason, however, to pigeonhole our decision in this case

into any specific category of nonjusticiability. We believe that "we should exercise our 'judicial discretion to dismiss the action without a determination on the merits'...." ... *Cf. Riegle v. Federal Open Market Committee....* *National Wildlife Federation v. Marsh,* 665 F.2d 390, 392 (D.C.Cir.1981) (citations omitted).

have standing to seek an injunction against this discriminatory practice, this employee has less need of such relief." The reasoning seems less objectionable here, I think, because we all feel that the "right" of these congressional plaintiffs to originate tax legislation is not really a personal entitlement but a public interest in the regularity of governmental process. That should lead to the conclusion, not that these plaintiffs should be denied equitable relief, but that they have no standing.