**David M. WALKER, Comptroller General of the United States, Plaintiff,**

v.

**Richard B. CHENEY, Vice President of the United States and Chair, National Energy Policy Development Group, Defendant.**

**No. CIV.A.02–0340 JDB.**

United States District Court, District of Columbia.

Dec. 9, 2002.

As Amended Dec. 13, 2002.

Carter G. Philips, Michael A. Nemeroff, Joseph R. Guerra, Gia B. Lee, Sidley Austin Brown & Wood LLP, Washington, DC, Anthony H. Gamboa, Gary L. Kepplinger, Lynn H. Gibson, Joan M. Hollenbach, Susan D. Sawtelle, General Accounting Office, Washington, DC, for Plaintiff.

Theodore B. Olson, Robert McCalllum, Jr., Paul D. Clement, Shannen W. Coffin, Thomas Millet, David B. Salmons, U.S. Department of Justice, Washington, DC, for Defendant.

## MEMORANDUM OPINION

BATES, District Judge.

This case raises compelling statutory and constitutional questions concerning the authority of the Comptroller General, and hence Congress, to require the Vice President to produce information relating to the President's decision-making on national energy policy. Each side casts its position in core constitutional terms invoking competing theories of the proper balance of power between the Legislative and Executive Branches, and insists that its opponent seeks to "work a revolution" in separation of powers principles. The case thus engenders a struggle between the political

branches that is historically unprecedented and that transcends both the specific information sought and the political identity of the Legislative and Executive Branch players involved.

Ultimately, however, equally fundamental separation of powers concerns relating to the restricted role of the Article III courts in our constitutional system of government ordain the outcome here. The parties agree that no court has ever before granted what the Comptroller General seeks—an order that the President (or Vice President) must produce information to Congress (or the Comptroller General). Because the Comptroller General does not have the personal, concrete, and particularized injury required under Article III standing doctrine, either himself or as the agent of Congress, his complaint must be dismissed. Historically, the Article III courts have not stepped in to resolve disputes between the political branches over their respective Article I and Article II powers; this case, in which neither a House of Congress nor any congressional committee has issued a subpoena for the disputed information or authorized this suit, is not the setting for such unprecedented judicial action.

## I. BACKGROUND

David M. Walker, Comptroller General of the United States, brings this action against Richard B. Cheney, Vice President of the United States and Chair of the National Energy Policy Development Group ("NEPDG"), in furtherance of an investigation by the General Accounting Office ("GAO") into the NEPDG's composition and activities. The NEPDG was a task force established by President George W. Bush to gather information and make recommendations to him in the area of energy policy. The Comptroller General is the head of the GAO, and an agent of the Legislative Branch. Presently before the Court are the Comptroller General's motion for summary judgment and the Vice President's motion to dismiss.

### A. The General Accounting Office and the Comptroller General

The GAO is "an instrumentality of the United States Government independent of the executive departments." 31 U.S.C. § 702(a) (2002). Congress created the GAO in 1921 in the belief that it " 'needed an officer, responsible to it alone, to check upon the application of public funds in accordance with appropriations.' " *See Bowsher v. Synar*, 478 U.S. 714, 730, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (quoting H. Mansfield, The Comptroller General: A Study in the Law and Practice of Financial Administration 65 (1939)). Congress has consistently viewed the Comptroller General as an officer of the Legislative Branch. Indeed, the Supreme Court in *Bowsher v. Synar* expressly found that the Comptroller General is subservient to Congress. *See* 478 U.S. at 730, 106 S.Ct. 3181.

Under statute, the Comptroller General is granted broad authority to carry out investigations and evaluations for the benefit of Congress. For example, 31 U.S.C. § 712 requires the Comptroller General to

(1) investigate all matters related to the receipt, disbursement, and use of public money;

(2) estimate the cost to the United States Government of complying with each restriction on expenditures of a specific appropriation in a general appropriation law and report each estimate to Congress with recommendations the Comptroller General considers desirable;

(3) analyze expenditures of each executive agency the Comptroller General believes will help Congress decide whether public money has been used and expended economically and efficiently;

(4) make an investigation and report ordered by either House of Congress or a committee of Congress having jurisdiction over revenue, appropriations, or expenditures; and

(5) give a committee of Congress having jurisdiction over revenue, appropriations, or expenditures the help and information the committee requests.

Section 717(b) of title 31 additionally requires the Comptroller General to "evaluate the results of a program or activity the Government carries out under existing law—(1) on the initiative of the Comptroller General; (2) when either House of Congress orders an evaluation; or (3) when a committee of Congress with jurisdiction over the program or activity requests the evaluation."

Since 1980, the Comptroller General has been able to enforce these investigatory powers by bringing a civil action in the United States District Court for the District of Columbia to require "the head of [an] agency to produce a record." § 716(b)(2). The instant case is, however, the first time the Comptroller General has ever done so. Prior to instituting such an action, the Comptroller General must follow a specific set of procedures. First, he must make a formal written request to the head of the relevant agency stating the authority for inspecting the records and the reason for the inspection. § 716(b)(1). If he is not given an opportunity to inspect the records within 20 days, he may file a report with the President, the Director of the Office of Management and Budget ("OMB"), the Attorney General, the head of the agency, and Congress. *Id.* He must then wait another 20 days before initiating a lawsuit. § 716(b)(2)(A).

Even when he has followed these procedures, the Comptroller General cannot necessarily bring a suit. Section 716(d)(1) precludes a civil action for access to records in three situations: (A) where the records at issue relate to activities that have been designated by the President as foreign intelligence or counterintelligence activities; (B) where a specific statute exempts the records from disclosure; or (C) where, within 20 days of filing of the Comptroller General's report under § 716(b)(1), the President or the Director of OMB "certifies to the Comptroller General and Congress that a record could be withheld under section 552(b)(5) or (7) of title 5 and disclosure reasonably could be expected to impair substantially the operations of the Government."

Over the decades, the GAO has conducted thousands of investigations and evaluations of federal programs and activities, resulting in thousands of reports to Congress. *See* Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem. Supp. Summ. J.") at 15. The GAO's investigations have extended to White House operations issues, including personnel practices, alleged abuses of executive travel, and information management systems. GAO probes have also touched upon the Executive Branch's policy-related activities, with reviews of, for example, a White House task force to promote passage of permanent normal trade relations with China and an advisory committee established by President Reagan with respect to the H.I.V. epidemic. *See id.* at 15–16.

## B. The Investigation of the NEPDG

The NEPDG was created by President Bush on January 29, 2001, "to develop a national energy policy designed to help the private sector, and as necessary and appropriate Federal, State, and local governments, promote dependable, affordable, and environmentally sound protection and distribution of energy." Compl., Ex. A at 2. In his memorandum establishing the NEPDG, President Bush directed the

NEPDG "to gather information, deliberate, and ... make recommendations to the President." *Id.* The NEPDG was to be comprised of the Vice President, the Secretary of the Treasury, the Secretary of the Interior, the Secretary of Agriculture, the Secretary of Commerce, the Secretary of Transportation, the Secretary of Energy, the Director of the Federal Emergency Management Agency, the Administrator of the Environmental Protection Agency, the Assistant to the President and Deputy Chief of Staff for Policy, the Assistant to the President for Economic Policy, and the Assistant to the President for Intergovernmental Affairs, as well as other officers of the federal government invited by the Vice President to participate (including the Chairman of the Federal Energy Regulatory Commission and the Secretary of State). *Id.* at 1–2. The Vice President was charged with presiding at the NEPDG's meetings, directing its work, and establishing, as appropriate, subordinate working groups. *Id.* at 2. President Bush also directed that the Department of Energy provide funding for the NEPDG to the maximum extent permitted by law and consistent with the need for funding determined by the Vice President after consultation with the Secretary of Energy. *Id.* at 2. In May 2001, the NEPDG issued a public report that recommended a set of policies, including proposed legislation, that was approved by the President as the National Energy Policy. *See* "Reliable, Affordable, and Environmentally Sound Energy for America's Future," Report of the National Energy Policy Development Group, *available at* www.whitehouse.gov/energy.

The GAO's investigation of the NEPDG was commenced on May 7, 2001, upon the request of two Congressmen, Representative John D. Dingell, Ranking Minority Member of the House Committee on Energy and Commerce, and Representative Henry A. Waxman, Ranking Minority Member of the House Committee on Government Reform. *See* Declaration of Margaret J. Reese ¶ 2. In an April 19, 2001, letter to the Comptroller General, Congressmen Dingell and Waxman had expressed concerns about the "conduct and composition of the task force" in light of "the apparent efforts of the task force to shield its membership and deliberations from public scrutiny." Compl., Ex. B at 1. They stated that it was their "understanding" that some of the task force's meetings had "included exclusive groups of non-governmental participants—including political contributors—to discuss specific policies, rules, regulations, and legislation." *Id.* They asked the Comptroller General to "undertake an investigation of the President's energy policy task force," including an examination of the identities of all task force members and staff, the attendees at task force meetings and the dates and locations of those meetings, and the criteria for determining which "non-federal entities" would be invited to participate at meetings. *Id.* at 1–2.

On May 8, 2001, GAO staff provided the Vice President's Counsel with a list of subjects in which it was interested, mirroring the specific items of interest identified by Congressmen Dingell and Waxman, and asked for a meeting with the Vice President's Counsel to discuss the investigation. Compl., Ex. C. The Vice President's Counsel responded on May 16, 2001, with a letter questioning the purpose and scope of the inquiry, as well as its legal basis. Compl., Ex. D at 1–2. He further asserted that the investigation raised constitutional concerns. *Id.* at 1. Nevertheless, "[a]s a matter of comity between the legislative and executive branches," the Vice President's Counsel provided a copy of information that had been previously provided to Members of Congress in response to similar inquiries. *Id.* This information indicated that NEPDG staff mem-

bers held meetings with individuals outside of government, but did not identify the names of NEPDG staff members, the names of persons in attendance at the NEPDG meetings or at meetings between staff and persons outside of the government, or the dates, locations, and subjects of any meetings with non-federal employees. *See id.* at Attachment 2.

Thereafter, on June 1, 2001, counsel for the GAO provided the Vice President's Counsel with a brief written explanation of the statutory basis for the GAO's authority to investigate, citing, *inter alia,* 31 U.S.C. §§ 712 and 717. Compl., Ex. F. Counsel for the GAO also submitted five follow-up questions relating to the NEPDG, and requested a meeting with the Vice President's Counsel and the Director of the NEPDG to discuss the GAO's review. *Id.*

Counsel for the Vice President responded in writing on June 7, 2001, raising specific challenges to the GAO's authority to investigate. Compl., Ex. G. "As a matter of comity," however, Counsel for the Vice President stated that he would seek information responsive to GAO's questions specifically related to costs incurred by the Vice President and the task force staff. *Id.* at 3. Documents relating to expenses incurred by the Office of the Vice President ("OVP") and the NEPDG staff were subsequently provided to the GAO, but according to the GAO, the documents failed to describe the nature or purpose of the listed expenditures. *See* Reese Decl. ¶ 6.

On June 22, 2001, counsel for the GAO sent to the Vice President's Counsel a ten-page letter outlining the GAO's statutory bases for its investigation. Compl., Ex. H. This letter was followed by several discussions between representatives of the GAO and the OVP in an effort to reach an agreement concerning the GAO's inquiry. Declaration of Anthony H. Gamboa ¶¶ 2–6. On June 29, 2001, and July 9, 2001, repre-

sentatives of the OVP asserted that the GAO had no authority to conduct the review. *Id.* ¶¶ 2, 4. Subsequently, on July 17, 2001, the Deputy White House Counsel indicated that the GAO would receive no additional documents from the OVP or the NEPDG staff. *Id.* ¶ 6.

The Comptroller General wrote directly to the Vice President on July 18, 2001, requesting "full and complete access ... to records relating to the development of the Administration's National Energy Policy." Compl., Ex. I. The Comptroller General requested the following information:

(1) For each of the nine NEPDG meetings convened at the White House Complex, the "names of the attendees for each meeting, their titles, and the office represented";

(2) for the six NEPDG staff persons assigned to the OVP, "their names, titles, the office each individual represented, the date on which each individual began working for such office, and the responsibilities of the group support staff";

(3) for each meeting held by an NEPDG staff person to gather information relevant to the NEPDG's work, "(a) the date and location, (b) any person present, including his or her name, title and office, or clients represented, (c) the purpose and agenda, (d) any information presented, (e) minutes or notes, and (f) how members of the NEPDG, group support staff, or others determined who would be invited to meetings";

(4) with regard to any meetings the Vice President as chair of the NEPDG had with individuals to gather information relevant to the NEPDG, "(a) the date and location, (b) any person present, including his or her name, title, and office, or clients represented, (c) the purpose and agenda, (d) any information presented, (e) minutes or notes, and (f)

how the Vice President or others determined who would be invited to the meetings"; and

(5) with regard to the direct and indirect costs of the NEPDG, "all records responsive to [GAO's prior] request, including any records that clarify the nature and purpose of the costs."

Pl.'s Mem. Supp. Summ. J. at 20. During a phone call between the Comptroller General and the Vice President's Counsel on July 31, 2001, the Comptroller General stated that he was eliminating the request for minutes and notes of the NEPDG meetings and for the information presented at those meetings. Declaration of David M. Walker ¶ 3.

On August 2, 2001, the Vice President submitted to the House of Representatives and to the Senate identical letters discussing the NEPDG records access dispute and asserting that the actions of the Comptroller General "exceed his lawful authority" and, "if given effect, would unconstitutionally interfere with the functioning of the Executive Branch." Compl., Ex. J at 1; Walker Decl. ¶ 4. The letter included a statement of the legal basis for the Vice President's challenge to the GAO's asserted authority for the investigation. Compl., Ex. J at Appendix Two.

The Comptroller General then filed a report on August 17, 2001, pursuant to 31 U.S.C. § 716(b) with the President, the Vice President, leaders of the Senate and the House, the Director of OMB, and the Attorney General, informing them of the dispute concerning access to the NEPDG records. Compl., Ex. K; Walker Decl. ¶ 5. The report elaborated on the purported bases for the GAO's power to investigate

the NEPDG and requested the Vice President's "assistance in resolving this matter in a timely manner." Compl., Ex. K at 10. Following the filing of the report, neither the President nor the Director of OMB made a timely certification under § 716(d)(1)(C), which might have precluded the Comptroller General from bringing a civil action for the requested records.

The Vice President's Counsel provided the GAO with the names of the six NEPDG staff members by letter dated September 6, 2001. Gamboa Decl. ¶ 8. Since that time, no further information of significance has been provided by the Vice President. *See id.*

In a letter dated January 22, 2002,[1] Senator Carl M. Levin (Chairman of the Senate Committee on Armed Services and the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs), Senator Joseph I. Lieberman (Chairman of the Senate Committee on Governmental Affairs), Senator Earnest Hollings (Chairman of the Senate Committee on Commerce), and Senator Byron L. Dorgan (Chairman of the Subcommittee on Treasury and General Government of the Senate Committee on Appropriations, and Chairman of the Subcommittee on Consumer Affairs, Foreign Commerce, and Tourism of the Senate Committee on Commerce, Science, and Transportation), "urge[d]" the Comptroller General to continue the investigation of the NEPDG. Compl. ¶ 45 and Ex. P. The Senators did not purport to be expressing or representing the views of those various Committees.[2] *See id.* Subsequently, on January 24, 2002, the Comptroller General informed the Vice President via telephone of

---

1. The long gap in the sequence of events was, according to the Comptroller General, due to his decision not to pursue this matter actively in the immediate aftermath of the tragedies of September 11, 2001. *See* Compl. ¶ 41 and Ex. N.

2. Of note, the letter was not signed by the Senators in their capacities as committee chairmen, nor was it written on letterhead from any committee.

the letter from the four Senators, and reaffirmed the GAO's desire to reach an accommodation on this matter. Walker Decl. ¶ 7. However, no compromise was reached. *See id.*

By letter of January 30, 2002, the Comptroller General advised the President Pro Tempore of the Senate and the Speaker of the House of Representatives that the GAO was preparing to file suit for the records in dispute. Compl., Ex. R; Walker Decl. ¶ 8. The President, Vice President, and various Chairmen and Ranking Minority Members of congressional committees were provided with copies of the letter. Compl., Ex. R at 3; Walker Decl. ¶ 8.

The Comptroller General filed this action seeking declaratory and injunctive relief on February 22, 2002. Specifically, relying upon his authority to investigate and evaluate under 31 U.S.C. §§ 712 and 717, and his right to obtain access to documents under § 716, the Comptroller General requests that the Court order the Vice President to produce documents

> that describe (1) who was present at each of the meetings conducted by the NEPDG, including the names of the attendees, their titles, and the office represented; (2) with whom the Vice President as Chair and each of the NEPDG support staff met to gather information for the proposed national energy policy, including the name, title and office or clients represented; and the date, purpose, agenda, and location of the meetings; (3) how the Vice President, the members of the NEPDG, or others determined who would be invited to the meetings; and (4) the direct and indirect

costs that were incurred in developing the proposed national energy policy.

Compl. at 24. The Comptroller General alleges that he seeks "such information to determine how the NEPDG's energy policy recommendations were developed, in order to aid Congress in considering proposed legislation, assessing the need for and merits of further legislative changes, and conducting oversight of the executive branch's administration of existing laws." Compl. ¶ 2.

Before defendant filed a response to the complaint, the Comptroller General moved for summary judgment on April 10, 2002.[3] Thereafter, on May 21, 2002, the Vice President filed a motion to dismiss and an opposition to the Comptroller General's motion.[4] A hearing on both motions was held on September 27, 2002.

## C. The Arguments on the Merits

In their briefs, the parties present starkly contrasting views as to the scope of both the GAO's power to investigate under statute and Congress's power to investigate under the Constitution. To the Comptroller General, the GAO's statutory power to investigate under § 712 is singularly expansive, extending, as that section states, to "all matters related to the . . . use of public money." Because the NEPDG undoubtedly "used" money—if only to place phone calls or utilize office space, or because salaried federal employees contributed their working time to the NEPDG—an investigation of the task force's composition and activities is, according to the Comptroller General, clearly authorized. Section 717(b), the Comp-

---

3. On April 18, 2002, the Court granted the parties' joint motion for an enlarged schedule for briefing dispositive motions and the parties' request to file briefs well in excess of the page limits established by the Local Rules of this Court. That briefing schedule stretched over more than four months.

4. The Court has received *amicus curiae* briefs from the Center for Government Integrity, on behalf of defendant, and from Senator Harry Reid of Nevada, on behalf of plaintiff.

troller General contends, provides yet further authorization. The NEPDG was a "program or activity the Government carries out under existing law," *see* § 717(b), the Comptroller General argues, and hence he is empowered to evaluate it, either on his own initiative or upon a request by a competent committee of Congress.

The GAO's broad investigatory power is not in the least bit problematic from a constitutional standpoint, the Comptroller General asserts, because the power of Congress (and by implication its agents) to investigate "is inherent in the power to make laws," *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 504, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975), and, indeed, is "as penetrating and far-reaching as the potential power to enact," *Barenblatt v. United States,* 360 U.S. 109, 111, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959). Congress is empowered under Article I of the Constitution to legislate in the area of energy, the Comptroller General argues, and therefore Congress has the corollary power to investigate in that sphere. Moreover, it was entirely permissible for Congress to delegate that investigative power to its agent, the Comptroller General.

The Vice President, on the other hand, argues that the investigatory power granted to the Comptroller General cannot possibly be as broad as suggested: if, by enacting the basic terms of § 712(1) in 1921, *see* Budget and Accounting Act, 1921, ch 18, § 312(a), 42 Stat. 25, Congress really did intend to confer a power to investigate as to any matter related to any use of federal money, no matter how incidental, no Presidential activity would be beyond the Comptroller General's reach and, moreover, there would have been no reason for Congress in 1970 to add § 717(b), *see* Legislative Reorganization Act of 1970, Pub.L. 91–510, § 204(a)-(c), 85

Stat. 1168. Properly construed, the Vice President argues, § 712 grants to the Comptroller General an investigative power that is more akin to an auditing or financial accounting function. Furthermore, § 717(b) does not apply here because the NEPDG was established by the President through constitutional, not statutory, prerogatives, and thus the NEPDG is not a "program or activity the Government carries out under existing law."

Moreover, according to the Vice President, the Comptroller General's interpretation of §§ 712, 716, and 717 is entirely untenable, as it contemplates a statutory structure that would be unconstitutional as applied to the Executive. The NEPDG, the Vice President explains, operated pursuant to the President's express constitutional powers to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices," U.S. Const. art. II, § 2, cl. 1, and to "recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient," U.S. Const. art. II, § 3, cl. 1. Specifically, consistent with the Opinions Clause, the President sought advice from the NEPDG on the development of energy policy in a way that was free from congressional or judicial participation; likewise, consistent with the Recommendations Clause, the President sought input from the NEPDG so he could "judge" which measures were "necessary and expedient" before submitting his legislative proposals to Congress. Because Congress lacks any power whatsoever to legislate with respect to the exclusive Presidential prerogatives reflected in the Opinions and Recommendations Clauses, and because Congress's investigative power is wholly derivative of its legislative power, the Vice President argues, it follows that Congress cannot investigate— nor can it delegate to the Comptroller General the power to investigate—the

NEPDG. *See Barenblatt,* 360 U.S. at 111–112, 79 S.Ct. 1081 ("Since Congress may only investigate into those areas in which it may potentially legislate or appropriate, it cannot inquire into matters which are within the exclusive province of one of the other branches of the Government.").

As an alternate argument, the Vice President contends that the Court should find the Comptroller General's asserted authority unconstitutional by balancing "how much the interference with the President's executive power prevents the President from accomplishing his constitutionally assigned functions against the overriding need to promote objectives within the constitutional authority of Congress." *See Ass'n of Am. Phys. & Surgeons, Inc. v. Clinton,* 997 F.2d 898, 910 (D.C.Cir.1993) (internal citations and quotation marks omitted).[5] Under such a test, the Vice President argues, the Comptroller General's investigation of the deliberative process by which the Vice President and others formulate policy recommendations for the President cannot be tolerated.

The Vice President maintains that the statute underlying the Comptroller General's lawsuit contains yet a further constitutional defect. Under 31 U.S.C. § 716(b)(2), the Comptroller General is authorized to bring a civil action in this Court to require the production of records that have been withheld. But the power to enforce laws through judicial means, the Vice President asserts, lies within the exclusive province of the Executive Branch by virtue of the Take Care Clause in Article II, § 3 of the Constitution. Accordingly, the Vice President argues, Congress cannot, consistent with separation of powers principles, endow the Comptroller General with the authority to bring this judicial action against the Executive Branch.

The serious constitutional problems emanating from the Comptroller General's broad view of his investigatory and enforcement powers, the Vice President suggests, counsel in favor of an interpretative approach that avoids the constitutional difficulties. According to the Vice President, the Court should apply the principle of constitutional avoidance to construe the relevant statutory language in a narrow fashion that would exclude the records at issue from the Comptroller General's review. In the alternative, he urges, the Court should find that the Comptroller General's power under § 716(b)(2) to bring a civil action against the "head of an agency" should be read as insufficient to justify a lawsuit against the Vice President; consistent with *Franklin v. Massachusetts,* 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), the Court should require a clear, express statement in the statutory text that Congress intends to permit lawsuits against the President and his principal advisors before allowing this case to proceed.

The Comptroller General, for his part, rejects the Vice President's suggestion that the investigation of the NEPDG and this judicial enforcement action are constitutionally problematic. The Executive Branch could have precluded suit altogether, he argues, had it certified the documents pursuant to § 716(d)(1). Moreover, the President still can assert executive privilege. No constitutional problem is raised, the Comptroller General contends, merely because the President may be required to expend "the political capital" necessary to certify the documents or assert privilege. Moreover, he urges, the Presi-

---

5. Although the D.C. Circuit in *Ass'n of Am. Phys. & Surgeons* did not apply the balancing test, it did note that a "statute interfering with a President's ability to seek advice directly from private citizens as a group, intermixed, or not, with government officials, ... raises Article II concerns." 997 F.2d at 910.

dent's use of federal funds to develop policy in an area that is frequently subject to legislation—energy—cannot be secreted from review by the Executive's invocation of the Opinions and Recommendations Clauses, which were not intended to provide the broad protections over confidentiality ascribed to them by the Vice President. The Vice President's constitutional arguments, the Comptroller General contends, are an ill-founded proxy for an assertion of privilege that the Executive has declined to make through the statutory certification process or otherwise. In addition, with respect to the Vice President's claim that a legislative agent lacks the power to compel disclosure through the Article III courts, the Comptroller General argues that such a view is based upon a misreading of *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), which in his view actually supports, rather than undermines, Congress's authority to enforce its power of inquiry judicially.

### D. The Vice President's Motion to Dismiss

On the merits, therefore, this case presents a clear constitutional confrontation between the political branches. The Comptroller General sets forth a vision of congressional oversight with respect to the Executive that is wide-ranging and potentially invasive, limited only by specific declarations of Executive privilege.[6] With his lawsuit, he calls upon this Court to vindicate his authority to investigate the very process by which the President collects recommendations and makes decisions. The Vice President counters that Congress's power to oversee the President is far more circumscribed and, specifically, that the swath of Presidential policy-making authority falling within the Opinions and Recommendations Clauses is entirely exempt from congressional (and hence GAO) review. Moreover, the Vice President argues, Congress lacks the power to call upon the Article III courts to enforce its rights to Executive Branch information. As historical confirmation, the Vice President stresses that no court has ever required the Executive Branch to produce documents sought by Congress or its agents. In sum, the parties proffer visions as to the scope of congressional oversight of the President—and thus the balance of power between the Executive and Legislative Branches—that clash at the most fundamental levels.

The Vice President, however, argues that this Court should not reach the merits of this dispute, but rather should dismiss the case because the Comptroller General lacks standing. Relying largely on *Raines v. Byrd*, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), the Vice President asserts that the Comptroller General has suffered no personal injury, and that any institutional injury is too abstract and hypothetical to confer standing in this setting. Notably, neither House of Congress, and no congressional committee, has authorized the Comptroller General to pursue the requested information through this

---

**6.** No assertion of Executive privilege has been made in this case, nor does this case pose the difficult question of the assertion of a privilege by the Executive Branch in the context of a criminal proceeding. *See, e.g., United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (assertion of Executive privilege in the context of a criminal prosecution); *In re: Lindsey*, 148 F.3d 1100 (D.C.Cir. 1998) (assertion of attorney-client privilege by Deputy White House counsel in the context of a grand jury investigation); *Nixon v. Sirica*, 487 F.2d 700 (D.C.Cir.1973) (en banc) (assertion of Executive privilege in the context of a grand jury investigation); *cf. In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir.), *cert. denied sub nom. Office of President v. Office of Independent Counsel*, 521 U.S. 1105, 117 S.Ct. 2482, 138 L.Ed.2d 991 (1997) (assertion of governmental attorney-client privilege by First Lady in the context of a grand jury investigation).

judicial proceeding. Moreover, the Vice President points out, no suit has ever previously been brought by the Comptroller General, and there is precious little precedent for judicial actions by Congress or its agents to obtain documents from the Executive. Thus, the Vice President argues, the Comptroller General has not alleged the type of injury that has traditionally been considered to be judicially cognizable. Moreover, because serious separation of powers issues abound here, the Vice President argues, the Supreme Court demands an "especially rigorous" standing assessment.

The Comptroller General, for his part, argues that his injury is personal, concrete, and particularized, because he has been deprived of specific information that is essential to the fulfillment of his duties to Congress. Furthermore, the Comptroller General contends, in pursuing his inquiry of the Vice President, he is exercising power delegated to him by Congress, which the Supreme Court has repeatedly

recognized possesses the power to compel process in aid of its investigatory powers. Consequently, he argues, there is no bar to the justiciability of his claim.

The Comptroller General's standing to pursue his claim must be determined as a threshold jurisdictional matter. *See Whitmore v. Arkansas*, 495 U.S. 149, 154, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) ("It is well established, however, that before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue."); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires.").[7] Hence, it is with an examination of the Vice President's motion to dismiss that the Court must begin—and ultimately conclude—its analysis.[8]

---

7. The Court must decline, therefore, the suggestion by counsel for the Vice President at the hearing in this matter to bypass standing and rule for the Vice President on the narrow ground that there is no express statutory statement permitting suit against the President or his principal advisors.

8. In addition to his motion to dismiss for lack of standing, the Vice President asks the Court to refrain from exercising jurisdiction as a matter of discretion in light of the separation of powers concerns raised by this case. He relies upon two strains of authority: first, a line of cases beginning with *Riegle v. Fed. Open Market Comm.*, 656 F.2d 873, 881 (D.C.Cir.1981), in which the D.C. Circuit, citing separation of powers concerns, declined to exercise jurisdiction as a matter of "equitable discretion" where a congressional plaintiff could obtain substantial relief through the legislative process from his fellow legislators; and, second, *United States v. AT & T Co.*, 551 F.2d 384 (D.C.Cir.1976), *appeal after remand*, 567 F.2d 121 (D.C.Cir.1977), in which the D.C. Circuit, instead of issuing a final decision on the merits of an inter-branch dispute over records in the hands of AT & T, required that the Legislative and Executive Branches attempt a negotiated solution.

Given the determination that the Comptroller General lacks standing, as discussed below, this Court need not reach defendant's arguments for discretionary dismissal. Although in theory the "equitable discretion" doctrine offers a compelling basis for a court to stay its hand in the face of serious separation of powers concerns, the scope of the doctrine remains unsettled in the aftermath of *Raines*. *See Chenoweth v. Clinton*, 181 F.3d 112, 115 (D.C.Cir.1999) ("*Raines* ... may ... require us to merge our separation of powers and standing analyses."). Moreover, the Court here is not presented directly with the type of intra-branch dispute between Members of Congress that is most typical of the equitable discretion cases. *See, e.g., Riegle*, 656 F.2d at 881 (doctrine of equitable discretion counsels dismissal where "plaintiff's dispute appears to be primarily with his fellow legislators"); *Moore v. United States House of Representatives*, 733 F.2d 946, 956 (D.C.Cir.

## II. ANALYSIS

### A. Principles of Standing

Article III of the Constitution restricts the jurisdiction of the federal courts to actual "Cases" and "Controversies." U.S. Const. art. III, § 2; *Flast v. Cohen,* 392 U.S. 83, 94, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). This is a "bedrock requirement," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), which has given rise to "several doctrines . . . 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.' " *Allen,* 468 U.S. at 750, 104 S.Ct. 3315 (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). These doctrines include justiciability, political question, standing, ripeness, and mootness.

 Perhaps the most important of the Article III doctrines is standing. *See id,* 468 U.S. at 750, 104 S.Ct. 3315. At a general level, " 'the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.' " *Id.* at 750–51, 104 S.Ct. 3315 (quoting *Warth,* 422 U.S. at 498, 95 S.Ct. 2197). More specifically, in order to establish standing, a plaintiff must satisfy three particular requirements related to his "injury":

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations and quotation marks omitted). "These requirements together constitute the 'irreducible constitutional minimum' of standing, which is an 'essential and unchanging part' of Article III's case-or-controversy requirement, and a key factor in dividing the power of government between the courts and the two political branches." *Vermont Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (internal citations omitted) (quoting *Lujan,* 504 U.S. at 559–60, 112 S.Ct. 2130).

In *Raines v. Byrd,* the Supreme Court elaborated on the requirements for "injury" in the context of a challenge by four Senators and two Congressmen to the constitutionality of the Line Item Veto Act. That Act provided that the President could "cancel" certain spending and tax benefit measures after he had signed them into law. *See* 521 U.S. at 814, 117 S.Ct. 2312. In order to effect such a cancellation, the President was required to send a special message to Congress specifying the canceled provision. *Id.* at 815, 117 S.Ct. 2312. Both Houses could then render the President's cancellation "null and void" by passing a one-sentence joint resolution. *Id.*

1984) ("[A]ppellants' dispute . . . is primarily a controversy with other members of Congress."). With regard to the *AT & T* cases, although there conceivably may be room for compromise with respect to any interest that

Congress may have in the documents at issue, *see infra* note 12, the Comptroller General and the Vice President do appear to have exhausted their attempts at settlement.

The plaintiffs in *Raines* alleged that the Act unconstitutionally expanded the President's power and violated the requirements of bicameral passage and presentment by allowing the President alone to cancel, and thus repeal, provisions of federal law. *Id.* at 816, 117 S.Ct. 2312. More specifically, they alleged that the Line Item Veto Act injured them directly and concretely in three ways:

> [by] (a) alter[ing] the legal and practical effect of all votes they may cast on bills containing such separately vetoable items, (b) divest[ing] the [plaintiffs] of their constitutional role in the repeal of legislation, and (c) alter[ing] the constitutional balance of powers between the Legislative and Executive Branches, both with respect to measures containing separately vetoable items and with respect to other matters coming before Congress.

*Id.* (citation omitted).

In considering whether these injuries were sufficient to give rise to standing, the Supreme Court highlighted that a "plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized to him." *Id.* at 819, 117 S.Ct. 2312 (citing *Lujan,* 504 U.S. at 560–61 & n. 1, 112 S.Ct. 2130). The Court also emphasized that the dispute raised by a complaint must be " 'traditionally thought to be capable of resolution through the judicial process.' " *Id.* (quoting *Flast,* 392 U.S. at 97, 88 S.Ct. 1942). Based on the injuries alleged, the Court concluded that the plaintiff Members of Congress had failed to meet their burden of establishing standing under these tests.

As an initial matter, the Court found that the asserted injury was not personal, but rather was institutional:

> [T]he injury claimed by the Members of Congress ... is not claimed in any private capacity but solely because they are Members of Congress. If one of the Members were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his successor instead.

*Id.* at 821, 117 S.Ct. 2312 (internal citation omitted). Thus, the Court held, plaintiffs had failed to demonstrate a sufficient "personal stake" in the dispute to establish standing. *Id.* at 830, 117 S.Ct. 2312.

In addition, the Court emphasized, even the institutional injury claimed by plaintiffs was inadequate for standing purposes. "Their claim is that the Act causes a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally." *Id.* at 821, 117 S.Ct. 2312. This loss of political power, the Court found, was not concrete and particularized, but rather "wholly abstract and widely dispersed." *Id.* at 829, 117 S.Ct. 2312.

An examination of historical practice, the Court noted, only further "cuts against" plaintiffs. *Id.* at 826, 117 S.Ct. 2312. In several analogous confrontations between one or both Houses of Congress and the Executive Branch, the Court observed, neither branch of government had brought suit based on a claimed injury to official authority or power. *Id.* at 826–28, 117 S.Ct. 2312. Thus, the Court concluded, a governmental system in which the judiciary entertained such claims "is obviously not the regime that has obtained under our Constitution to date." *Id.* at 828, 117 S.Ct. 2312. "Our regime contemplates a more restricted role for Article III courts." *Id.*

Although the Supreme Court's decision in *Raines* was based firmly upon its conclusions that the congressional plaintiffs "have alleged no injury to themselves as individuals, ... the institutional injury they allege is wholly abstract and widely

dispersed, . . . and their attempt to litigate this dispute at this time and in this form is contrary to historical experience," *id.* at 829, 117 S.Ct. 2312, the Court also identified certain other factors relevant to its decision. For example, the Court "attach[ed] some importance to the fact that [plaintiffs] have not been authorized to represent their respective Houses of Congress in this action, and indeed, both Houses actively oppose their suit." *Id.* In addition, the Court noted that its conclusion "neither deprives Members of Congress of an adequate remedy (since they may repeal the Act or exempt appropriation bills from its reach), nor forecloses the Act from constitutional challenge (by someone who suffers a judicially cognizable injury as a result of the Act)." *Id.*[9]

### B. Standing in the Constitutional Context

▮ There is no doubt here that the issues framed by the parties invoke core separation of powers questions at the heart of the relationship among the three branches of our government. In assessing whether the Comptroller General has asserted a sufficient injury to establish standing, the Court must therefore be mindful that the standing inquiry should be "especially rigorous" because reaching the merits of this dispute could require deciding whether an action taken by one of the other branches of government was unconstitutional. *Raines*, 521 U.S. at 819, 117 S.Ct. 2312. As the Supreme Court has observed, the power to declare actions of the other branches unconstitutional should be "a tool of last resort" because it "is . . . the ultimate threat to the continued effectiveness of the federal courts in performing that role." *Valley Forge*, 454 U.S. at 474, 102 S.Ct. 752. Over time, repeated

use of the judicial power to negate the actions of the representative branches of government may erode both public confidence in the judiciary and the vitality of the other branches. The judiciary, therefore, must " 'refrain[ ] from passing upon the constitutionality of an act [of the representative branches] unless obliged to do so in the proper performance of [the] judicial function, when the question is raised by a party whose interests entitle him to raise it.' " *Id.* (quoting *Blair v. United States*, 250 U.S. 273, 279, 39 S.Ct. 468, 63 L.Ed. 979 (1919)). This requirement is an "importan[t] . . . precondition [that] should not be underestimated as a means of 'defin[ing] the role assigned to the judiciary in a tripartite allocation of power.' " *Id.* (quoting *Flast*, 392 U.S. at 95, 88 S.Ct. 1942).

▮ In sum, in light of the "overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere," this Court must conduct its standing inquiry "carefully," *Raines*, 521 U.S. at 820, 117 S.Ct. 2312, and with "reference to the Art. III notion that federal courts may exercise power only in the last resort and as a necessity, and only when adjudication is consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process." *Allen*, 468 U.S. at 752, 104 S.Ct. 3315 (internal citations and quotation marks omitted).

### C. Plaintiff's Alleged Injury Is Insufficient

▮ Applying the Supreme Court's standing jurisprudence and, in particular, the decision in *Raines v. Byrd*, the Court concludes that plaintiff has failed to meet

---

9. In fact, the Line Item Veto Act was subsequently found unconstitutional in a challenge brought by non-congressional plaintiffs. *See* *Clinton v. City of New York*, 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998).

his "burden of establishing that [his] claimed injury is personal, particularized, concrete, and otherwise judicially cognizable." *Raines*, 521 U.S. at 820, 117 S.Ct. 2312. As an initial matter, plaintiff certainly has suffered no personal injury here. Mr. Walker's interest in this dispute is solely institutional, relating exclusively to his duties in his official capacity as Comptroller General of the United States. Although the Vice President's refusal to disclose the requested documents may have frustrated plaintiff in his efforts to fulfill his statutory role, plaintiff himself has no personal stake in this dispute. He does not claim that he has "been deprived of something to which [he] **personally** [is] entitled." *Id.* at 821, 117 S.Ct. 2312. As with the Members of Congress in *Raines*, if plaintiff "were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his successor instead." *Id.*[10]

The institutional injury that plaintiff suffers as Comptroller General is also insufficient to confer standing. Plaintiff alleges that he seeks "to enforce his right to access to records that [he] requires in order to conduct an investigation and evaluation of the NEPDG." Compl. ¶ 52. On a superficial level, an injury to such a statutory right to information might appear to be sufficiently concrete and particularized to give rise to standing. But plaintiff is not an independent constitutional actor; he is, as the Supreme Court indicated in *Bowsher*, subservient to Congress. *See* 478 U.S. at 730, 106 S.Ct. 3181. Indeed, plaintiff states plainly in his complaint that he seeks the records at issue "in order to aid Congress," Compl. ¶ 2, and further notes

in his briefs that he is "an agent of the legislative branch," Pl.'s Mem. Supp. Summ. J. at 5, and "acts as an agent for Congress," Plaintiff's Consolidated Reply in Support of His Motion for Summary Judgment and Opposition to Defendant's Motion to Dismiss ("Pl.'s Cons.Reply") at 73 n. 45. Plaintiff acknowledges that he "has brought this action to vindicate his own statutory rights in order to assist Congress as a whole," Pl.'s Cons.Reply at 18, and he conceptualizes his injury as a "frustrat[ion]" to "the exercise of his delegated authority" from Congress, *id.* at 21 (emphasis omitted).

Plaintiff even turns to Article I in identifying the source of his power to bring this suit, arguing that he "is exercising Congress's ancillary power to compel compliance with investigative demands." *Id.* at 81. On the merits of the case, too, plaintiff relies on the fact that his authority is derived from Congress, proffering, for example, that in assessing the constitutionality of his investigation, the Court should weigh any intrusion upon the Executive Branch against "Congress's need to perform its constitutionally assigned functions." *Id.* at 73 (first emphasis added). In short, plaintiff recognizes that the investigatory prerogatives that have allegedly been frustrated (and the enforcement power that he now seeks to employ) obtain to him only because they have been delegated by Congress. Plaintiff has no freestanding institutional injury or personal injury of his own to assert—a fact which severely undermines his claim for standing. *See Warth*, 422 U.S. at 499, 95 S.Ct. 2197 ("The Art. III judicial power exists

---

10. Plaintiff relies on *FEC v. Akins*, 524 U.S. 11, 21, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), and *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989), in which the Supreme Court found that a plaintiff suffers an injury-in-fact when he is denied information that must be disclosed pursuant to statute. But those were lawsuits brought by private parties, not government officials, and thus involved injuries in which the plaintiffs (having no official, governmental interests) had only a personal stake.

only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction can be invoked only when the plaintiff himself has suffered some threatened or actual injury." (internal quotation marks omitted)).

To the extent that the Court must look beyond the Comptroller General's injury and consider the harm to his principal, Congress, such an examination is of little comfort to plaintiff. Plaintiff alleges that he seeks the records at issue to "aid Congress in considering proposed legislation, assessing the need for and merits of future legislative changes, and conducting oversight of the executive branch's administration of existing laws." Compl. ¶ 3. Later in his complaint, plaintiff alleges somewhat more specifically that the requested information "will assist Congress in evaluating the proposed national energy policy that the NEPDG developed" because it "will inform Congress as to whether the policy was formulated based on input from a broad representation of affected groups, whether Congress ought to elicit the views of other interested parties and constituencies, and whether and to what extent it may be appropriate for Congress to commission further studies." Id. ¶ 39. Plaintiff also alleges that access to the records will "assist Congress in determining whether and to what extent future legisla-

tion, relating, for example, to national energy policy or openness in government, may be appropriate" and will facilitate Congress's "oversight of the manner in which the executive branch implements the law." Id.[11]

But regardless of how specifically plaintiff attempts to couch Congress's interest in the GAO's investigation, the import of the requested documents to Congress, as plaintiff himself acknowledges, is essentially that the records will "assist Congress in the discharge of its legislating and oversight functions." Id. Moreover, if it is these general interests in lawmaking and oversight that are allegedly impaired by defendant's failure to produce the requested records, then the possible injury to Congress is too vague and amorphous to confer standing. See Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 221 n. 10, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) ("The legislative function is inherently general rather than particular."). Like the injury asserted in Raines, any congressional injury here concerns merely an "abstract dilution of institutional legislative power," Raines, 521 U.S. at 826, 117 S.Ct. 2312, "which necessarily damages all Members of Congress and both Houses of Congress equally," id. at 821, 117 S.Ct. 2312, and is therefore not the type of concrete injury that is sufficiently " 'distinct and palpable' " to confer standing.

11. Plaintiff asserts in his brief that he also requires the information in order to determine whether the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app 2 (2002), applied to the NEPDG. But no claim under FACA (or the Administrative Procedure Act) has been asserted in the Complaint, and issues relating to FACA are, if anything, tangential to this lawsuit. The Court notes, however, that in two cases consolidated as *Judical Watch, Inc. v. National Energy Policy Development Group,* Civ. No. 01–1530(EGS) (D.D.C.), private parties are seeking information relating to the NEPDG on the theory that FACA's disclosure requirements apply to that entity. The Executive Branch has taken the position in those cases that FACA does not apply because neither the NEPDG nor associated working groups included non-governmental members. *See* Memorandum in Support of Defendants' Motion for a Protective Order and for Reconsideration at 6, *Judicial Watch* (filed September 30, 2002); *see also* 5 U.S.C. app. 2 § 3(2)(C) (excluding from definition of "advisory committee" any "committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government").

*Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (quoting *Warth,* 422 U.S. at 501, 95 S.Ct. 2197).

Granted, the potential impact upon Congress here may be more concrete than the injury in *Raines* in one sense—any harm here relates to a reasonably well-defined set of information. Indeed, there is some authority in this Circuit indicating that a House of Congress or a committee of Congress would have standing to sue to retrieve information to which it is entitled. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon,* 498 F.2d 725 (D.C.Cir.1974) (en banc); *United States House of Representatives v. United States Dep't of Commerce,* 11 F.Supp.2d 76 (D.D.C.1998), *appeal dismissed,* 525 U.S. 316, 344, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999). But here the record reflects that Congress as a whole has undertaken no effort to obtain the documents at issue, that no committee has requested the documents, and that no congressional subpoena has been issued. Thus, an injury with respect to any congressional right to information remains wholly " 'conjectural' or 'hypothetical,' " *Lujan,* 504 U.S. at 560, 112

S.Ct. 2130 (quoting *Whitmore,* 495 U.S. at 155, 110 S.Ct. 1717), and Congress retains alternate means to seek the information—a factor cited by the Supreme Court in *Raines.* *See* 521 U.S. at 829–30, 117 S.Ct. 2312.[12]

In this regard, it is of "some importance" that, like the plaintiffs in *Raines,* the Comptroller General here has not been expressly authorized by Congress to represent its interests in this lawsuit. *See id.* at 829, 117 S.Ct. 2312. Indeed, the Comptroller General has identified only two Congressmen and four Senators who have expressed support for his investigation as a general matter, and has not identified any Member of Congress (other than *amicus* Senator Reid) who has explicitly endorsed his recourse to the Judicial Branch.[13]

Plaintiff, however, argues that, by enacting 31 U.S.C. §§ 712, 716, and 717, Congress as a whole has already delegated to the Comptroller General the authority to investigate the Vice President and to bring this enforcement action in aid of the investigation. Plaintiff contends, moreover, that the delegation and exercise of Congress's investigative powers are "peculiarly

**12.** At the hearing in this matter, counsel for the Vice President noted that Congress has "plenty of practical leverage" to get the requested information, including refusing to act on the President's energy proposal until the information is produced. Transcript of September 27, 2002, Hearing at 53. "Then there can be a give-and-take; there can be a process of accommodation between the branches ... which is the way that Congress has gotten information for over 200 years." *Id.* As the D.C. Circuit observed in declining to rule on the merits of the document dispute presented in *AT & T,*

> the resolution of conflict between the coordinate branches in these situations must be regarded as an opportunity for a constructive modus vivendi which positively promotes the functioning of our system. The Constitution contemplates such accommo-

dation. Negotiation between the two branches should thus be viewed as a dynamic process affirmatively furthering the constitutional scheme.

567 F.2d at 130. *See also Goldwater v. Carter,* 444 U.S. 996, 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (Powell, J., concurring in the judgment) ("The Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach a constitutional impasse.").

**13.** Although Congress arguably could remove the Comptroller General "for any number of actual or perceived transgressions of the legislative will," *Bowsher,* 478 U.S. at 729, 106 S.Ct. 3181, it would be a substantial leap for the Court to infer that because Congress has not removed the Comptroller General from office, Congress as a whole has authorized or even approved of his lawsuit.

within the realm of the legislature," *Watkins v. United States*, 354 U.S. 178, 205, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957), and thus this Court may not "insist that Congress or its agents resort to non-litigative means of seeking information, such as issuance of a committee subpoena or adoption of a House resolution of inquiry," Pl.'s Cons.Reply at 24. Further, citing *Reed v. County Com'rs*, 277 U.S. 376, 388, 48 S.Ct. 531, 72 L.Ed. 924 (1928), plaintiff asserts that it was entirely proper for Congress to delegate to him the power to pursue this civil action.

By observing that Congress has failed to endorse the Comptroller General's lawsuit or issue its own subpoena, however, this Court does not intend to direct the delegation and exercise of Congress's investigative powers. Instead, the Court only notes that the availability of an alternate remedy, together with the absence of voiced Congressional support for this particular lawsuit, counsels against a conclusion that the exercise of judicial power at this time is warranted as a " 'last resort, and as a necessity.' " *Allen*, 468 U.S. at 752, 104 S.Ct. 3315 (citation omitted). Both these factors were, after all, cited by the Supreme Court in *Raines*. *See* 521 U.S. at 829, 117 S.Ct. 2312.[14]

Moreover, in *Reed* the Supreme Court held only that a special committee created by the Senate could not "invoke the power of the Judicial Department" because it did not have express authorization from the Senate to do so. *See* 277 U.S. at 388–89, 48 S.Ct. 531. Thus, *Reed* stands for the proposition that Senate authorization is one prerequisite for a suit by a committee, not that such authorization is sufficient to create standing for a congressional agent. More recently, the fact that Congress as a whole had granted "adversely affected" Members of Congress a statutory right to challenge the Line Item Veto Act did not persuade the Court in *Raines* that those plaintiffs had standing under the Constitution to pursue their case. *See* 521 U.S. at 815, 820 n. 3, 117 S.Ct. 2312.

Perhaps in some theoretical sense Congress did authorize this lawsuit in 1980 when it granted the Comptroller General judicial enforcement power. But this Court must conduct an "especially rigorous" standing inquiry, *see id.* at 819, 117 S.Ct. 2312, in this context of a constitutional confrontation between the political branches in order to ensure that "constitutional adjudication, the most important and delicate of its responsibilities, ... does not take place unnecessarily." *Schlesinger*, 418 U.S. at 221, 94 S.Ct. 2925. Here, the highly generalized allocation of enforcement power to the Comptroller General twenty-two years ago hardly gives this Court confidence that the current Congress has authorized this Comptroller General to pursue a judicial resolution of the specific issues affecting the balance of

---

**14.** The Supreme Court in *Raines* also noted that its conclusion that the plaintiffs before it lacked standing did not foreclose the Line Item Veto Act from a future challenge "by someone who suffers judicially cognizable injury as a result of the Act." 521 U.S. at 829, 117 S.Ct. 2312. Here, in fact, private parties have brought an action in which NEPDG documents are sought, *see* supra note 11 (although it is not readily apparent that the set of information potentially available to private parties under FACA or other information-seeking statutes is co-extensive with the set of information to which the Comptroller General is allegedly entitled). The Court does not opine on whether Congress would have standing to enforce judicially a subpoena for the NEPDG documents that the Comptroller General seeks. But in any event, the Supreme Court has held that the "assumption that if [plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." *See Schlesinger*, 418 U.S. at 227, 94 S.Ct. 2925. "Our system of government leaves many crucial decisions to the political processes." *Id.*

power between the Article I and Article II Branches that have crystalized during the course of this dispute and lawsuit. Much less does the blanket authorization embodied in § 716 compel the conclusion that Congress needs the Court to resolve at this time whether it has either the power to investigate the process by which the President seeks opinions and formulates recommendations or the constitutional authority to bring enforcement actions against the Executive Branch in aid of its investigations. *See Allen*, 468 U.S. at 752, 104 S.Ct. 3315.[15]

### D. The Historical Perspective

An analysis of historical practice does not turn the standing assessment in plaintiff's favor by demonstrating a judicially cognizable injury. As an initial matter, it is undisputed that no Comptroller General has ever sued the Executive Branch for access to records. In that sense, this lawsuit is unprecedented.

Moreover, the relief plaintiff seeks would be unprecedented as well, for it is likewise undisputed that no court has ever ordered the Executive Branch to produce a document to Congress or its agents. Indeed, although Congress and the Executive Branch have had disputes about access to Executive Branch documents since the early days of the republic, *see* Todd D. Peterson, Prosecuting Executive Branch

Officials for Contempt of Congress, 66 N.Y.U.L.Rev. 563, 568–69 (June 1991), plaintiff has not identified any Supreme Court decision recognizing standing for Congress or its agents to sue in such a setting.

The principal historical precedents cited by plaintiff in the context of inter-branch information disputes are two D.C. Circuit cases—*Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C.Cir.1974) (en banc), in which a Senate committee sought enforcement of its subpoena to President Nixon for White House tapes, and *United States v. AT & T*, 551 F.2d 384 (D.C.Cir.1976), *appeal after remand*, 567 F.2d 121 (D.C.Cir.1977), in which the Executive Branch challenged a congressional subpoena for documents in the hands of AT & T. Both cases are of limited relevance to the inquiry into "traditional[ ] thought," *Raines*, 521 U.S. at 819, 117 S.Ct. 2312, because of their relatively recent vintage. Moreover, in each case, in contrast to this setting, a congressional committee had taken the step of issuing a subpoena and the relevant House of Congress had also passed a resolution expressly endorsing pursuit of the lawsuit. *See Senate Select Comm.*, 498 F.2d at 727; *AT & T*, 551 F.2d at 391. Even so, in neither case did the D.C. Circuit order production of the requested records. In *Senate Select Committee*, the court concluded that the

---

**15.** The constitutional standing analysis here has shades of prudential standing concepts as well. *See Flast*, 392 U.S. at 99, 88 S.Ct. 1942 ("[T]here are at work in the standing doctrine the many subtle pressures which tend to cause policy considerations to blend into constitutional limitations."). As the Supreme Court has noted in the prudential standing context, "the courts should not adjudicate [third persons'] rights unnecessarily, and it may be that in fact the holders of those rights ... do not wish to assert them." *Singleton v. Wulff*, 428 U.S. 106, 113–14, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Moreover, "third parties themselves usually will be the best

proponents of their own rights" and may prefer to advocate those rights themselves "to the extent they will be bound by the courts' decisions under the doctrine of Stare decisis." *Id.* at 114, 96 S.Ct. 2868. Here, where the Comptroller General seeks an adjudication as to issues directly affecting the scope of Congress's powers to investigate and invoke judicial process, it is perhaps prudent for the Court to decline to recognize standing in the absence of some indication from Congress that it wishes the Comptroller General to pursue these issues to resolution by the judiciary. The parties have not, however, invoked prudential standing concepts.

committee had not demonstrated that the information was critical to the proper fulfillment of the committee's functions. *See* 498 F.2d at 733. And in AT & T, the court—citing the prevalence of "nerve-center constitutional questions"—declined to rule on the merits of the dispute and instead ordered the parties to pursue settlement. *See* 551 F.2d at 394; *see also,* 567 F.2d at 123. Thus, neither case is persuasive precedent for granting the relief plaintiff requests.[16]

The only other historical evidence cited by plaintiff in the realm of inter-branch information disputes is not judicial in nature. Rather, plaintiff relies primarily upon the fact that the Senate in 1928 authorized all of its standing committees to sue, *see Senate Select Comm. on Presidential Campaign Activities v. Nixon,* 366 F.Supp. 51, 56 n. 8 (D.D.C.1973) (quoting S. Res. 262, 70th Cong. (1928)), and that this authorization remains in effect with respect to subpoenas directed to federal officials. *See* Pl.'s Cons.Reply at 12–13, 24. This fact, while of some weight, is not particularly persuasive given that, with the exception of the circumstances giving rise to the decision in *Senate Select Committee,* 498 F.2d at 725, plaintiff has not directed the Court to any situation in which the

Senate has actually invoked this authority to sue.[17]

Plaintiff also points out that the Office of Legal Counsel ("OLC") has concluded that Congress has the power to bring a civil action to enforce a subpoena. *See* Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act, 10 Op. Off. Legal Counsel 68, 87–88 (1986) (civil enforcement of subpoena by Congress "would appear to be a viable option"); Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 Op. Off. Legal Counsel 101, 137 & n. 36 (1984) ("Congress could ... vindicate its asserted right to obtain any documents by a civil action for enforcement of a congressional subpoena."). However, these pre-*Raines* OLC opinions from the 1980s are not evidence of a deeply-rooted, traditional view that the courts should entertain disputes between the political branches concerning congressional requests for information. Moreover, the opinions identify no case other than *Senate Select Committee* in which a court has actually decided the merits of an inter-branch information dispute brought to the courts by Congress or a congressional committee.

16. A third case plaintiff relies upon, *United States v. House of Representatives,* 556 F.Supp. 150 (D.D.C.1983), provides even less historical support for his claim. There, the Executive Branch sought a declaration that the Administrator of the EPA had acted properly in refusing to release documents subpoenaed by a congressional subcommittee. The district court declined to rule on whether the Executive Branch had standing, and instead dismissed the case on the ground that judicial resolution of the underlying executive privilege issue would never become necessary in the absence of further action by Congress or prosecutorial action by the Executive Branch. *Id.* at 153. Although the court noted in *dictum* that judicial resolution of the executive privilege issue might ultimately be required,

the court was contemplating the possibility of a future criminal or other contempt proceeding against the Administrator, *see id.* at 151–53, a context not at all analogous to the civil action presented here.

17. Plaintiff notes that other statutes or congressional rules also authorize Congress or its agents to bring judicial actions. But those provisions do not necessarily pertain to inter-branch disputes and are largely focused on the power to seek immunity orders. *See* Pl.'s Cons.Reply at 78 (citing, *inter alia,* 18 U.S.C. § 6005 (2002), which allows a House of Congress, committee, or subcommittee to institute judicial action for an immunity order). Thus they are of little relevance to the historical inquiry here.

To the extent that the Court's historical inquiry should focus not just on inter-branch disputes over information, but on alleged injury to legislative power more generally, the Supreme Court's analysis in *Raines* entirely dispels any notion that such a claim of injury has traditionally been thought to be capable of vindication through the judicial process. *See* 521 U.S. at 826–28, 117 S.Ct. 2312. Specifically, the Court in *Raines* observed that in "analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power." *Id.* at 826, 117 S.Ct. 2312; *see also Barnes v. Kline*, 759 F.2d 21, 41 (D.C.Cir.1984) (Bork, J., dissenting) ("[L]itigation directly between Congress and the President concerning their respective constitutional powers and prerogatives ... was unknown through more than a century and three quarters of our jurisprudence."); *Moore v. United States House of Representatives*, 733 F.2d 946, 960–61 (D.C.Cir.1984) (Scalia, J., concurring in the result) ("The Supreme Court itself, of course, has never found standing to resolve, or reached the merits of, an intra- or inter-branch dispute presented by a federal officer whose only asserted injury was the impairment of his governmental powers."). To the contrary, our constitutional "regime contemplates a more restricted role for the Article III courts":

> The irreplaceable value of the power articulated by Mr. Chief Justice Marshall [in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803),] lies in the protection it has afforded the constitutional rights and liberties of individual citizens and minority groups against oppressive or discriminatory government action. It is this role, not some amorphous general supervision of the operations of government, that has maintained public esteem for the federal courts and has permitted the peaceful coexistence of the countermajoritarian implications of judicial review and the democratic principles upon which our Federal Government in the final analysis rests.

*Raines*, 521 U.S. at 828–29, 117 S.Ct. 2312 (quoting *United States v. Richardson*, 418 U.S. 166, 192, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (Powell, J. concurring)).[18] As Justice Souter noted in his opinion concurring in the judgment in *Raines*, "a dispute involving only officials, and the official interests of those, who serve in the branches of the National Government lies far from the model of the traditional common-law cause of action at the conceptual core of

---

18. Similar views that the role of the judiciary is properly limited to the adjudication of individual rights were expressed many years ago by two judges questioning this Circuit's now-defunct legislative standing doctrines. *See Barnes*, 759 F.2d at 42 (Bork, J., dissenting); *Moore*, 733 F.2d at 959 (Scalia, J., concurring in the judgment). Judge (now Justice) Scalia stated in *Moore* that

> [judges] sit here neither to supervise the internal workings of the executive and legislative branches nor to umpire disputes between those branches regarding their respective powers. Unless and until those workings, or the resolution of those inter-branch disputes through the system of checks and balances ... brings forth a result that harms private rights, it is no part of our constitutional province, which is solely, to decide on the rights of individuals.

733 F.2d at 959 (citation and quotation marks omitted). Judge Bork further elaborated in *Barnes* that "direct intermediation of the courts in disputes between the President and the Congress," 759 F.2d at 41, improperly "work[s] to enhance the power and prestige of the federal judiciary at the expense of those other institutions," *id.* at 42. "No doubt it appears more 'convenient' to let congressmen sue directly and at once; in actually, that convenience is purchased at the cost of subverting the constitutional roles of our political institutions." *Id.*

the case-or-controversy requirement." *Id.* at 833, 117 S.Ct. 2312.

Overall then, the historical inquiry provides, at most, marginal support for plaintiff's position. No Comptroller General has ever instituted suit for Executive Branch records, and although there is some limited precedent for the view that Congress or a duly authorized committee may have a judicially cognizable right to bring a lawsuit for such information, this evidence is non-judicial or relatively recent, and centers around the judicial enforcement of congressional subpoenas—a circumstance obviously not presented here. Moreover, as the Supreme Court noted in

*Raines,* the role of the Article III courts has not historically involved adjudication of disputes between Congress and the Executive Branch based on claimed injury to official authority or power.[19]

In the end, given that the Article I and Article II Branches have been involved in disputes over documents for more than two hundred years, what is most striking about the historical record is the paucity of evidence that the instant lawsuit is " 'of the sort traditionally amendable to, and resolved by, the judicial process.' " *Vermont Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 774, 120 S.Ct.

---

**19.** Following the Supreme Court's decision in *Raines,* a three-judge panel of this Court reached the merits of a lawsuit filed on the basis of alleged injury to Congress (although not on the basis of alleged diminution of legislating power). *See United States House of Representatives v. United States Dep't of Commerce,* 11 F.Supp.2d 76 (D.D.C.1998). The Supreme Court dismissed the direct appeal in that case because the Court resolved the relevant substantive issues by virtue of its decision in a companion case brought by noncongressional plaintiffs. *See Dep't of Commerce v. United States House of Representatives,* 525 U.S. 316, 344, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999). Moreover, the district court decision is of little relevance to an assessment of "traditional" views due to its recency.

In any event, the case is readily distinguishable. There, the House of Representatives as a whole—not individual congressmen or a congressional agent—challenged the Commerce Department's use of statistical sampling to supplement the headcount enumeration used to apportion Representatives among the states. 11 F.Supp.2d at 79. The House alleged that it was injured because it had not received from the Census Bureau a proper accounting of the number of persons in each state, as required under the Census Act, 13 U.S.C. § 1 *et seq.,* and because use of statistical sampling would result in an unlawful and unconstitutional composition of the House. *Id.* at 84.

The three-judge panel concluded that the House had standing to pursue its claims. The case "falls within the narrow area left by the

Court [in *Raines* ]," the court concluded, because the House had been deprived of information to which it, as a legislative body, was personally entitled and which it required in order to perform a mandatory constitutional function—the apportionment of Representatives among the states. *Id.* at 89. Moreover, the court concluded, "the institutional interest ... is particularized to the House of Representatives because the House's composition will be affected by the manner in which the Bureau conducts the Census." *Id.* The court also emphasized that the House had been specifically granted authority by statute to prosecute the lawsuit, *id.,* and that the lawsuit presented an "extremely rare case" in which a House of Congress could "satisf[y] Article III's rigorous demands," *id.* at 90.

Here, in contrast, the Comptroller General undoubtedly has no personal interest in the lawsuit, and his institutional interest is entirely derivative of Congress's interest. Congress itself has not endorsed this lawsuit and retains other options for procuring the documents (e.g., a subpoena). Moreover, although the Comptroller General's failure to obtain the documents may result in some generalized harm to legislative power, this injury does not pertain to a highly specific constitutional mandate (such as the duty to apportion Representatives) nor does it threaten the composition of Congress itself. The Comptroller General, in short, does not present nearly as strong a case for standing as the House of Representatives did in its suit.

1858, 146 L.Ed.2d 836 (2000) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)).[20] Plaintiff has not made a compelling showing that the justiciability of his claim is well-established in "the regime that has obtained under our Constitution to date." *Raines*, 521 U.S. at 828, 117 S.Ct. 2312.[21] Given the weakness of plaintiff's arguments that his injury is sufficiently personal, concrete, and particularized, plaintiff's failure to produce stronger evidence with respect to historical practice leads unavoidably to the conclusion that he lacks standing to pursue his claim.

## III. CONCLUSION

The parties have presented significant statutory and constitutional issues that, on the surface, appear in need of judicial resolution. However, the judiciary must refrain from "deal[ing] with [ ] difficult and sensitive issue[s] of constitutional adjudication on the complaint of one who does not allege 'a personal stake in the outcome of the controversy.'" *Schlesinger*, 418 U.S. at 224, 94 S.Ct. 2925 (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). Here, the Comptroller General has suffered no personal injury as a private citizen, and any institutional injury exists only in his capacity as an agent of Congress—an entity that itself has issued no subpoena to obtain the information and given no expression of support for the pursuit of this action. The absence of congressional endorsement for the investigatory and enforcement efforts of its agent—especially where this lawsuit has profound implications for Congress's own investigatory and enforcement powers—leaves to "the realm of speculation whether there is a real need to exercise the power of judicial review," *id.* at 221, 94 S.Ct. 2925, and deprives this action of the " 'concrete adverseness . . . upon which the court so largely depends for illumination of difficult constitutional questions,'" *id.* at 224, 94 S.Ct. 2925 (quoting *Baker*, 369 U.S. at 204, 82 S.Ct. 691). The historical record, moreover, does not suggest that plaintiff's "attempt to litigate this dispute at this time and in this form" is consistent with historical experience. *See Raines*, 521 U.S. at 829, 117 S.Ct. 2312.

In light of the important constitutional questions presented, the Court cannot gloss over defects in justiciability. Indeed, the Supreme Court in *Raines* has required an "especially rigorous" standing inquiry in this setting, with due regard for "keeping the Judiciary's power within its proper constitutional sphere." *Id.* at 819–820, 117 S.Ct. 2312. This rigorous standing assessment may seem overly protective of the

---

**20.** Plaintiff relies upon *Vermont Agency* for the proposition that Congress could assign to a private citizen the United States's claim for injury. Be that as it may, not only is assignment of a civil claim by the United States to a private citizen far different from the delegation of congressional power at issue here, but the Supreme Court's conclusion in *Vermont Agency* that a private citizen has standing to bring a *qui tam* action under the False Claims Act was buttressed by a "long tradition of *qui tam* actions in England and the American Colonies." *Id.* at 774, 120 S.Ct. 1858. In fact, the Court traced the origin of *qui tam* actions to the 13th and 14th centuries, *id.* at 774–75, 120 S.Ct. 1858, and noted that the historical evidence was "well nigh conclu-

sive" that the *qui tam* dispute at issue was traditionally thought to be amenable to judicial resolution, *id.* at 777, 120 S.Ct. 1858. The historical evidence favoring plaintiff's position here, in contrast, is virtually nonexistent.

**21.** The legislative standing cases in this Circuit, which have been largely discredited by *Raines*, provide no historical support for plaintiff's claim. *See Chenoweth v. Clinton*, 181 F.3d 112, 117 n. * (D.C.Cir.1999) ("*Raines* leaves no room for the broad theory of legislative standing that we adopted in *Moore* and [*Kennedy v. Sampson*, 511 F.2d 430 (D.C.Cir.1974)]. ").

Vice President, and hence of the Executive Branch, at the expense of the statutory responsibilities of the Comptroller General and the constitutional obligations of Congress. But the point is not whether the Executive Branch or the Comptroller General (an agent of Congress) is correct with respect to this particular dispute or even with respect to their competing views of the proper balance of power between the Article I and Article II branches. Rather, the question is whether the Comptroller General can require the Article III courts to enter and resolve this inter-branch dispute in light of the weighty separation of powers considerations incorporated into the standing analysis required under *Raines*. Such an excursion by the judiciary would be unprecedented and would fly in the face of the restricted role of the federal courts under the Constitution. Accordingly, the complaint must be dismissed.

A separate order has been issued on this date.

### *ORDER*

Upon consideration of Defendant's Motion to Dismiss, the hearing on September 27, 2002, and the entire record, it is hereby ORDERED that the motion is GRANTED. The action is hereby DISMISSED.